**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

CITY OF HIGHLAND PARK,
a Michigan municipal corporation,

       Plaintiff,                          Case No.
                                            Hon.

vs

UNITED STATES ENVIRONMENTAL PROTECTION
AGENCY (USEPA); GINA McCARTHY, individually and
in her capacity as Administrator, USEPA;
ROBERT KAPLAN, individually and in his capacity as
Acting Administrator, USEPA Region 5;
MICHIGAN DEPARTMENT OF ENVIRONMENTAL
QUALITY (MDEQ); KEITH CREAGH, individually and in his
capacity as Director of MDEQ; MICHIGAN DEPARTMENT
OF TRANSPORTATION (MDOT); KIRK T. STEUDLE,
individually and in his capacity as Director of MDOT;
GREAT LAKES WATER AUTHORITY (GLWA);
and SUE McCORMICK, individually and in her capacity
as Executive Director of GLWA, and WAYNE COUNTY,
MICHIGAN,

       Defendants.

---

WILLIAM R. FORD (P35870)                CALVIN B. GRIGSBY (Cal. Bar No. 53655)
Attorney for Plaintiff                        *Pro hac vice*
Ford Law Firm                                Attorney for Plaintiff
613 Abbott St., 1st Floor                    2406 Saddleback Drive
Detroit, Michigan 48226                    Danville CA 94506
(248) 790-6812                                (415)860-6446
fordattyford@aol.com                       cgrigsby@grigsbyinc.com

---

## **COMPLAINT**

      COMES NOW Plaintiff, the City of Highland Park ("Highland Park"), by counsel, and

for its Complaint for Injunctive Relief against the Defendants, United States Environmental

Protection Agency ("USEPA"); Gina McCarthy, individually and as Administrator of the

USEPA, and Robert Kaplan, individually and as Acting Regional Administrator of the USEPA, Region 5 (collectively, "EPA"); Michigan Department of Environmental Quality, and Keith Creagh, individually and as Director of the Michigan Department of Environmental Quality (collectively, "MDEQ"); Michigan Department of Transportation, and Kirk T. Steudle, P.E., individually and as Director of  Michigan Department of Transportation (collectively "MDOT"); Great Lakes Water Authority, as successor in interest to Detroit Water and Sewer Department, and Sue McCormick, individually and in her capacity as Executive Director of Great Lakes Water Authority (collectively "GLWA"); and Wayne County, Michigan, hereby alleges as follows:

## I.      BACKGROUND.

1. Highland Park has been hit with a GLWA court judgment that puts a 250.6970 millage user charge increase on *ad valorem* property tax rolls of households and commercial businesses to satisfy a $30,000,000 assessment for sewer treatment charges and judgment interest by GLWA, which violates Clean Water Act (the "Act" or, alternatively, "CWA") requirements of:

   - Subscriber charges based on each user class paying its proportionate share of costs incurred,

   - The Act's prohibition of charges for sewer services based on *ad valorem* property tax values unless the grantee had a dedicated *ad valorem* tax system on December 27, 1977 (which GLWA did not have) rather than a user charge system based on actual use under § 35.929-1(a)(1).

2

- The Act's requirements that large dischargers of pollution secure permits and pay their fair share of treatment costs, even if they are state governmental units. (See, e.g. 40 CFR § 35.2140—Exhibit B).

- The Act's requirement that GLWA's user charge system, including specifically one based on *ad valorem* taxes, must first be approved by the  Regional Administrator  (§ 35.2140).

2. To put this in context, Michigan Const. Art. IX, § 6 (2016) states that the total amount of general *ad valorem* taxes imposed upon real and tangible personal property for all purposes in any one year shall not exceed 15 mils on each dollar of the assessed valuation of property as finally equalized (except for voter approved bonds), and the *ad valorem* taxes imposed for user charges by GLWA for Highland Park sewer services, as authorized by MDEQ and EPA, for Highland Park's falsely alleged underpayment of its proportionate share of sewer treatment fees is 16.7 times that State constitutional limit.

3. The GLWA sewer user charges *ad valorem* assessment will increase the  typical household property tax in  Highland Park from $837.85 yearly to $3,695.79 in a City where estimated median household income ("MHI") in 2013 was $18,660 (compared to MHI for the entire state of Michigan of $48,273) (Exhibit A).  This *ad valorem* user charge to the typical Highland Park household  is 19.8% of MHI on top of the monthly sewer bill which is 8.4% of MHI in 2014 (Exhibit F, p.1)—a combined *ad valorem* and monthly sewer user charge of  28.2% of MHI which is impossible to pay.

4. GLWA's violations of 40 CFR § 35.2208, which provides that the grantee shall implement the user charge system and sewer use ordinance developed under §§ 35.2130

and 35.2140 for the useful life of the treatment works, includes, for illustration and not as limitation, and to be further developed by proof, the following:

- The average rates based on MCF (water usage) Highland Park has been charged by GLWA for the last decade has been far in excess of the charges levied against other communities and wholesale users. (Exhibit C).

- The GLWA discriminatorily charges Highland Park approximately 3.15 times more than the GLWA wholesale customer with the lowest charge. (*Id.*)

- Since 1996, GLWA has continuing violations of the Act, which is incorporated into the Agreement (as defined below) and which provides that "The rate shall conform to Section 204(b)(1) of Public Law 92-500, as amended, and regulations of the United States Environmental Protection Agency (hereinafter referred to as the U.S. EPA), being 40 CFR, 35.929 through 35.929-3 (Exhibit E, p. 4).

- Since at least 1996, GLWA has had a continuing practice of disproportionately charging Highland Park for sewer services in violation of the Act and regulations thereunder and the Highland Park-GLWA Agreement in violation of its obligations to develop a user charge system based on actual use under 40 CFR § 35.929-1(a).

- Highland Park is being charged over three times more for sewer services than other similarly situated wholesale customers even though Highland Park has the lowest MHI of any of GLWA's comparative wholesale customers (Exhibit C).

- Discordant with EPA policies which permit lower user charge rates for low-income residential users (*See,* 40 CFR § 35, Subpart E, Appendix B, Federal

Guidelines - User Charges for Operation and Maintenance of Publicly Owned Treatment Works), Highland Park, the lowest income community served by GLWA, is charged the highest user charge rates of any other subscribing community. (Exhibit C) *See,* § 35.2140 (i).

5. In 1996, Detroit and Highland Park entered into a consent decree and settlement agreement (Exhibit D) under former Federal Judge John Feikens to resolve all arrearages, and after August 1, 1996, payment obligations under the June 1983 agreement (Exhibit E). (The consent decree and settlement and the June 1983 agreement are referred to collectively as the "Agreement.") The Agreement required the payment of $7.5 million in cash for past due amounts and the payment of 65% of a newly-imposed water and sewer rate increase to $34.71 per mcf for all future "current services" on and after August 1, 1996, or $22.56 per mcf. (See, Exhibit D, par. 1(a), 5 and 6.)

6. Under the Agreement, Highland Park has paid GLWA $28,168,886.24 from 2005 to 2015. (*See*, Exhibit D-1, "Post consent decree payments.") The amount due for this period (adding year 2005 in amounts equal to 2006 and amount due in 2014 for 2015 from Exhibit F) under the consent decree is $28,925,178.[1] GLWA has billed Highland Park sewer users $50,745,730.51 (Dates: October 2004 to December 2015) and has put the wrongfully claimed amount due on Highland Park homeowners and other property owners as an *ad valorem* tax (Exhibit A). The claimed amount due placed on property owners as an *ad valorem* tax is the completely erroneous amount of $22,576,844.27; the City of Highland Park has paid $28,168,886.24. (Exhibit D-1)

---

[1] 2,938,769.62 +$23,641,799+2,344,610.26 =$28,925,178.

7. Exhibit D-1, prepared from accounting records and Exhibit F, prepared independently from engineering studies, are remarkably consistent. Just between 2006 and 2004, GLWA has charged Highland Park $17,395,577 more than the amount of Highland Park's proportionate share of sewer treatment costs as set forth in the Agreement in violation of the CWA and the Agreement, which incorporates the CWA and regulations therein. (Exhibit F, p. 2.)

8. GLWA's overcharges of Highland Park for this 8 year period, 2006-2014, are depicted in the chart below:



From Exhibit F, p.2.

9. MDOT's Drainage Manual provides that "Whenever a stormwater conveyance system from a State trunkline project is connected into an existing public or private stormwater conveyance system outside of MDOT R.O.W. (not allowed in combined sewers), a written agreement on the design, construction, and future operation and maintenance of the stormwater system must be obtained from the owner of the system." It further

provides that "an equitable sharing of cost must be agreed upon in a written agreement." MDOT has refused to implement its policy to only send its stormwater into a locality's combined sewer system after getting an agreement to pay its fair share of treatment costs in Highland Park, and only in Highland Park.

10. The failure to pay Highland Park the equitable share of costs of treatment paid to GLWA as well as the costs of maintaining and operating the Highland Park sewer system is also a direct violation of § 301 of the CWA.  The MDOT NPDES stormwater permit, which is provided by MDEQ, fails to impose the requirements of a point source discharger on MDOT inadvertently by attempting to treat MDOT as a half point source and half non-point source when the discharge is sent through municipal treatment works.  MDOT's permit, which expired in 2009, provides that "The discharge of storm water commingled with discharges authorized under other NPDES permits is authorized under this permit." (Exhibit R)  The NPDES Permit issued to MDOT by MDEQ establishes MDOT as a point source discharger that is attempting to avoid regulation under Clean Water Act section 301(b) by sending most of it discharges of pollution through Highland Park and other municipal sewer systems by paying much less than the sewer operations and maintenance and treatment costs.  MDOT has taken its deadbeat use of sewer services to the extreme in Highland Park by paying nothing at all.

11. Runoff from the MDOT's Davison freeway flows into drainage structures called "catch basins", which are essentially oversized pipes.  Woodward has similar drainage structures as well, which are owned and maintained by MDOT.  MDOT's drainage structures are themselves point sources. Wayne County's drainage structures are point sources. Although the dollar amounts are less, the allegations in this complaint regarding MDOT's

violations of the CWA, apply equally to Wayne County, specifically including allegations against MDOT for failing to pay its proportionate share which apply to and are hereby incorporated into claims against Wayne County. (See, Exhibit H, "Study by Highland Park Engineering Department.")  MDOT's and Wayne County's drainage structures fit in the "point source" definition squarely because "pipe, ditch, channel, etc." are expressly identified as examples of point sources.  Section 502(12) states that "The term "discharge of a pollutant" and the term "discharge of pollutants" each means (A) any addition of any pollutant to navigable waters from any point source, (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft."

12. Section 301(b) does not exclude MDOT and Wayne County from regulation of their effluent as a point source discharger for that potion of the stormwater that goes into a combined sewer system.  Section 301(i)(2)(A) provides in pertinent part that a point source like MDOT may discharge into a "publicly owned treatment works" on or before July 1, 1988, and then only if it pays its fair share of §204 costs:

> If the Administrator (or if appropriate the State) finds that the owner or operator of such point source has acted in good faith, he may grant such request and issue or modify such a permit, which shall contain a schedule of compliance for the point source to achieve the requirements of subsections (b)(1)(A) and (C) of this section and shall contain such other terms and conditions, including pretreatment and interim effluent limitations and water conservation requirements applicable to that point source, as the Administrator determines are necessary to carry out the provisions of this Act.

> (B) No time modification *** shall be granted unless (i) the publicly owned treatment works will be in operation and available to the point source before July 1, 1988, and will meet the requirements to subsections (b)(1) (B) and (C) of this section after receiving the discharge from that point source; and (ii) the point source and the publicly owned treatment works have entered into an enforceable contract *requiring the point source to discharge into the publicly owned treatment works, the owner or operator of such point source to*

8

*pay the costs required under section 204 of this Act*, and the publicly owned treatment works to accept the discharge from the point source; and (iii) the permit for such point source requires point source to meet all requirements under section 307 (a) and (b) during the period \*\*\*"

13. MDOT as a point source discharger is not exempt from the CWA because it discharges into Highland Park's sewer system. It must still comply with §301, §307, and other relevant provisions of the Act. MDOT (and Wayne County as well) has met neither requirement to have an enforceable contract with Highland Park. Rather, MDOT has gone to the Court of Claims to secure a ruling that it has no obligation to pay Highland Park in violation of §204.

14. Moreover, some of MDOT's stormwater discharged by MDOT as a point source is not "received by a publicly owned treatment works in heavy rainy season. Some of the stormwater runoff goes into the adjoining municipal sewer, then into the NPDES permit holder catch basins, then the navigable waterways without going into a "treatment plant or works" because it exceeds the treatment capacity of GLWA treatment plants. The court must enjoin MDOT's undisputed violations, and MDEQ's lack of enforcement, of the Act, including declaring the courts' judgments in the MDOT action (Exhibit N) and Wayne County actions (Exhibit T) void as in violation of the Act. (40 CFR § 35.2140 (h))

15. Highland Park is the only combined sewer system in the State of Michigan where MDOT has refused to implement the requirement of the Act to pay for stormwater treatment from its point sources. For example, MDOT and Detroit signed an agreement for stormwater going into Detroit's combined sewer system in 1989 (Exhibit G), but MDOT continued to discharge stormwater into Highland Park's combined system next door, for the same highways and trunklines that leave Detroit and run through Highland Park. This was and is an intentional act of discrimination against Highland Park.

16. GLWA is also in violation of §204 of Act because it directly caused  MDOT's non-payment by breach of Detroit's Agreement with Highland Park "to establish rules and regulations that shall conform to Section 204 (b)(1)(A) of Public Law 92-500, as amended, and regulations of the United States Environmental Protection Agency (hereinafter referred to as the U.S. EPA), being 40 CFR, 35,929 through 35.929-3, and shall achieve a proportionte User Charge System which is effective throughout the BOARD's (i.e. Detroit's)  service area."  Detroit was specifically required *to include in its billings to Highland Park* the amounts due from all "commercial, governmental and industrial users" and "consistent with the City of Detroit." (See, Exhibit E, p. 14) The Agreement therefore required Detroit to include in its billings to Highland Park the separate amounts due from governmental user MDOT "consistent with" the 1989 stormwater agreement (as it may be amended) Detroit had with MDOT so that Highland Park could transmit these billings to MDOT.

17.  MDOT owes Highland Park $10,753,783.14 for stormwater treatment services from 1984 through 2005, not including interest. (Exhibit H)  MDOT has used the well-funded and well-staffed State Attorney General's legal power to overwhelm Highland Park's meager legal resources in obtaining court rulings allowing MDOT to continue to avoid any payment.  (Exhibit I, Order allowing non-payment by MDOT) (*See, also,* similar ruling allowing Wayne County to avoid payment under §204.  (Exhibit T)  Both of these rulings violate 40 CFR  § 35.2140(h), "Inconsistent Agreements," which provides:

> The user charge system shall take precedence over any terms or conditions of agreements or contracts which are inconsistent with the requirements of section 204(b)(1)(A) of the Act and this section.

18. EPA and MDEQ, in violation of the CWA, and GLWA have allowed MDOT to get away with forcing its stormwater discharges on Highland Park, without paying any of MDOT's proportionate share of Highland Park's treatment costs, in violation of the Agreement, and by not enforcing the Act's mandatory provisions requiring MDOT, whose state roadways are major point sources of stormwater discharges, to comply with the Act's requirements to get a permit for its pollution discharges and otherwise pay the amount of its proportionate share as any other major discharger, whether industrial, commercial or governmental.

19. GLWA, since 1989, continues to charge Highland Park to treat stormwater generated by point sources owned and controlled by MDOT, and continues to include the amounts due from MDOT, consistent with the amount GLWA charges MDOT, in its billings to Highland Park based on water usage, in breach of the Agreement between GLWA and Highland Park, when GLWA knows that MDOT's stormwater is not a component of water usage.  The unbilled MDOT charges from GLWA's breach of its Agreement, $10,753,783.14, and GLWA's own overcharges in violation of the Settlement Agreement (see, paragraphs 1(a), and 6 of Exhibit D) through 2014, $22,576,844.27 (Exhibit D-1), total $33,330,627.41.  This means GLWA owes Highland Park $3.33 million, not including interest and operating and maintenance ("O&M") costs owed by MDOT.  This amount completely sets off the roughly $30 million of *ad valorem* taxes imposed for sewer treatment charges GLWA claims Highland Park owes GLWA-- and requires a significant surplus being returned to Highland Park.

20. Unless the Court orders an offset of the amounts owed by MDOT and GLWA to Highland Park under the "proportionate share" mandates of the Act, the collection of

these overcharges wrongfully imposed as *ad valorem* taxes in violation of the Act will financially devastate impoverished Highland Park households who have already paid the full amount ordered by Judge Feikens in 1996 to DWSD and have no ability to pay these confiscatory *ad valorem* tax bills.

21. Plaintiff also requests declaratory relief that the $30 million DWSD judgment in Judge Murphy's Court is invalid because it violates federal law. (See, Exhibit O, Exhibit A, thereto).

22. The actions of EPA, MDEQ, MDOT, and GLWA are also in violation of Executive Order 12898 of February 11, 1994, "Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations"(Exhibit J), of which the Court may take judicial notice, even though not actionable herein.

23. As set forth in Exhibit A, GLWA's overcharges plus MDOT's non-payment, directly causing the *ad valorem tax increases of 440% on the average household* in violation of the Act, will cause widespread foreclosure of low-income residents' homes and dislocation and disruption of their lives, households and ability to make a living and provide for their families.

24. EPA and MDEQ have also violated 33 U.S.C. §1342(b)(1)(c)(ii) by allowing GLWA/DWSD an operating permit from MDEQ where there have been intentional misrepresentations and non-disclosures that non-operating indirect costs wrongfully passed along to GLWA's wholesale customers were, in actuality, capital improvement and operating costs for services rendered (when no capital costs or O&M costs benefitting wholesale subscribers were involved.)

25. In December 2011, over $310 million in swap acceleration fees on Detroit Sewer Fund interest rate swaps and forward starting swaps were triggered when Gov. Rick Snyder appointed a fiscal review board to begin to investigate Detroit's finances. (Exhibit K, Bond Buyer Article; Exhibit L, CFO Explanation.)

26. On June 30, 2012, DWSD issued $659 million in senior lien revenue bonds where the bulk of the proceeds were used to pay these swap acceleration fees.  The net result is that the amount of debt being passed along to wholesale subscribers from swap acceleration fees caused by a default related to the governor's appointment of a fiscal review board for the City of Detroit-- which did not add any value to the DWSD capital plant benefitting sewer user subscribers or wholesale customers-- was charged to Wholesale customers as increased sewer fees and falsely identified as capital costs. (*See*, non-sequitur caption "Assets not subject to depreciation in Exhibit M, third page.) A capital asset not subject to depreciation has no value to any wholesale customer in treating wastewater.

27. Exhibit M are pages from the DWSD-audited balance sheets for comparison from 2005 and 2014. The net capital depreciable assets, *less* long-term revenue bond fixed liabilities in 2005, was a positive $338,447,314, and by 2014 the net capital depreciable assets, *less* long-term revenue bonds, was a negative ($711,172,334). The CFO report fails to disclose this loss in depreciable or "useful for waste water treatment" assets in its report in Exhibit L.

28. Making speculative bets that interest rates would increase [when most economists saw rates coming down] represents the bulk of the GLWA's $700 million to $1 billion dollars of financial losses passed on to its wholesale and retail customers.  In a complete cover-up of this fiscal mismanagement, Sue McCormick has publicly shifted the blame to

Highland Park for rapidly rising user charges.  (Exhibit S)  As GLWA's audits clearly
show, GLWA has over $1 billion dollars in revenue bond debt with no depreciable assets
to show for it.   The court must enjoin GLWA to adjust its debts in compliance with
§35.2140(d), which states:

> "d) Financial management system. Each user charge system must
> include an adequate financial management system that will accurately account
> for revenues generated by the system and expenditures for operation and
> maintenance *(including replacement) of the treatment system*, based on an
> adequate budget identifying the basis for determining the annual operation and
> maintenance costs and the costs of personnel, material, energy and
> administration."

29. GLWA has hidden from users that roughly 30% of the debt expenditure for revenue
bonds do not result from new capital expenditures for depreciable assets replacing worn
out fixed assets, thereby reducing maintenance costs for the treatment system.  All of the
suburban and wholesale customers are being gouged for gross financial management
negligence by GLWA management.

30. The Agreement bars any flow-through charges to Highland Park as a wholesale customer
for revenue bonds to pay swap derivative losses and losses from other risky financial
instruments.  Section 2 of the operating agreement provides:

> (2)   Maximum Debt Financing.   The BOARD shall obtain capital
> funds for the expansion, renewal and reconstruction of common use or solely
> suburban use major capital assets or improvements from the issuance of
> revenue bonds" (1982 Agreement P. 5-6)

31. In plain English, GLWA had over $700 million more in debt than "major capital assets or
improvements" for which revenue bonds may be issued under the Agreement.  GLWA
has no major capital assets or improvements to show for a debt burden exceeding 30-40%
of operating costs. GLWA has wasted $700 million to $1 billion in bond debt being

charged to wholesale customers as recovery of capital asset costs when there is nothing to show for this debt.

32.    In the 2014 audit, the auditor, KPMG, tried to cover up the fact that debt was now greater than depreciable capital assets by taking out the line item from 2005, "*invested in capital assets, net of related debt,*" and by adding a new accounting line item, "*Assets not subject to depreciation,*" to cover up the fact that revenue bond proceeds had been used to pay non-operating costs from swap acceleration fees and other risky derivatives contracts costs caused by City of Detroit financial problems resulting in a State financial takeover which had no asset value or value to  providing sewer services to wholesale and suburban customers who were being charged sewer treatment fees for losses from  these financial derivatives contracts and other fiscal mismanagement losses.

33. In fairness to wholesale suburban and other retail customers, these non–operating swap acceleration fees from fiscal mismanagement of Detroit, which were "triggered" by the governor's response to the City of Detroit's financial problems, should have been charged to the City of Detroit or to the State, who were responsible for the "triggering" of acceleration fees.  These costs should have been included as a debt in the *City of Detroit* bankruptcy, rather than being passed along to wholesale and suburban and retail customers.

34. In the case of Highland Park, the amount of sewer treatment fees which Highland Park was overcharged in 2013 was $2,598,396.  (Exhibit F)  The annual amount of the overcharge jumped to $4,542,817, in 2014, as a result of  increased debt burden from  the financial, swap and fiscal mismanagement of those involved—a $2 million increase in overcharges from financial derivatives mismanagement costs and other financial services,

fiscal mismanagement, and soft costs unrelated to providing any sewer treatment services

to Highland Park. (Exhibit F)

35. The 1983 Agreement forbids passing along these financial derivatives mismanagement

costs since they were not reasonably related to the service provided  as follows:

> (5)     All costs other than those costs recovered by surcharges as here
> before set forth, may be recovered by volume alone, or by volume and
> surcharges, or by any method which provides a distribution of costs
> ***reasonably related to the service provided.(Exhibit E, p. 10)***

36. Other suburban and wholesale customers have similar provisions in their contracts with

GLWA.

37. The spread between the decreases in depreciable assets used to provide sewer services

versus the amount of revenue debt sold to make capital improvements is over $1 billion

dollars.  This means wholesale and retail customers are paying $1 billion too much in

debt passed along as higher rates.  As reflected by Exhibit K, GLWA has never honestly

disclosed to its customers that almost one-third of the debt is for swap fees and other

costs that have no capital assets to show for the money borrowed and therefore produces

no benefit to customers.

38. EPA and MDEQ must require a reduction in rates to all customers to reflect this $1

billion loss from investments in speculative derivatives contracts of no value to wholesale

or suburban customers.   But for the fact that the $310 million in swap acceleration or

termination fees were disguised as capital expenditures rather than non-operating

expenditures in the 2014 CAFR, GLWA would be in a deficit condition under MCL

§141.921, which would allow a GLWA bankruptcy filing to reduce its debt to be

commensurate with the value of assets providing services to customers.

39. In short, Highland Park has been cheated out of $17,395,577 by GLWA's overcharges after 2006-2014 (Exhibit F), $22,576,844.27 (Exhibit D-1) from 2005-2015 and $10,753,783.14 by MDOT's non-payment for dumping its polluted stormwater through Highland Park's sewer system.  GLWA's billing failed to disclose MDOT's non-payment consistent with the payments for stormwater MDOT made to GLWA.  This resulted in GLWA's failure to charge Highland Park its proportionate share and MDOT's failure to pay its proportionate share, both in violation of the Act and the Agreement which incorporates the proportionate share requirements of the Act.

## II.      NATURE OF THE CASE.

40. Highland Park has sued the EPA, MDEQ, MDOT and GLWA under the Act, as amended, 33 U.S.C. § 1251 *et seq.*, and the Federal Mandamus Statute, 28 U.S.C. § 1361. Pursuant to the citizen suit provision of the Act, 33 U.S.C. § 1365(a) and (b), Plaintiff seeks injunctive relief and a writ of mandamus.

### *Citizen Suit under §1365(a).*

41. Section 1365(a) provides: "…any citizen may commence a civil action on his own behalf -- (1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of an effluent standard or limitation under this Act …" [33 USCS §§ 1251 *et seq.*].

42. As a "person . . . having an interest which is or may be adversely affected," 33 U.S.C. § 1365(g), Highland Park would qualify as an eligible plaintiff under §1365(a) (1). All of the defendants are persons who violate an effluent standard or limitation under the Act. (*Allegheny County Sanitary Auth. Bangor Borough Auth. v. United States EPA*, 732 F.2d

1167, 1175 (3d Cir. Pa. 1984).  The City of Highland Park is the statutory representative of its citizens under state law and its charter.

43. According to Appendix 2D of the MDOT Drainage Manual: "Whenever a stormwater conveyance system from a State trunkline project is connected into an existing public or private stormwater conveyance system outside of MDOT R.O.W. (not allowed in combined sewers), *a written agreement on the design, construction, and future operation and maintenance of the stormwater system must be obtained from the owner of the system.*" (Emphasis supplied.)

44. When Highland Park attempted to deny MDOT free sewer service allowing discharge of polluted stormwater into Highland Park's combined sewer system, MDOT used its sovereign immunity power at the Court of Claims to get a ruling it had no duty to pay its proportionate share, but could continue to discharge the polluted stormwater into Highland Park's combined sewer system, for which Highland Park had to pay GLWA to treat.  (*See*, Exhibit I, ruling of the Court of Claims).  Wayne County received a similar ruling.  (Exhibit N)

45. MDOT received its court order allowing it to continue to dump pollutants into the Highland Park combined sewer system for free even after reaching a settlement agreement with Detroit to pay for stormwater dumped into Detroit's combined sewer system (Exhibit I, which is an act of intentional discrimination against Highland Park under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000D *et seq*.).

46. The EPA, MDEQ, MDOT and GLWA-- the MDEQ permittee which has passed MDOT's treatment costs back to Highland Park-- have since 1996 required Highland Park to assume all of MDOT's polluted stormwater treatment costs without tendering to

Highland Park an agreement for even a payment of the partial costs of the treatment service amount required by the Drainage Manual. (Exhibit Q)

47. Moreover, MDOT's failure to pay its proportionate share of treatment costs charged by GLWA to Highland Park has contributed to overcharges to Highland Park where Highland Park pays GLWA significantly more than its proportionate share.  (See, Exhibit C, Exhibit F, and Exhibit H).

48. As a result, MDOT has discharged millions of gallons of stormwater containing pollutants into Highland Park's combined sewer system, a small portion  of which goes directly into the Rivers without pre-treatment or treatment without the NPDES permit required of point source dischargers under §301 in violation of effluent restrictions and limitations of the Act by MDEQ or EPA without any payment at all (i.e., for free) in violation of the Act's requirement that all point source dischargers pay their proportionate share of treatment costs.

49. Some of the stormwater discharged by MDOT from its state highway point sources go directly into waterways without any monitoring or reporting as required by 33 U.S.C. §1318 or as a CSO without treatment at all. The value of free polluted stormwater treatment services provided to MDOT with the approval of the EPA, MDEQ, and GLWA in violation of the effluent standards and limitations under the Act has exceeded $10,000,000 million.  (See, Exhibit H, "Study by Highland Park Engineering Department.")

50. Secondly, GLWA has violated the Act by passing along costs attributed to the financial woes of the City of Detroit as sewer user costs.  The sewer fund is supposed to be an enterprise fund which is not impacted by the Governor's takeover of financial matters

from Detroit.  Accordingly, GLWA must restructure its finances so that depreciable assets at least equal revenue debt to comply with its permit requirements.

51. MDEQ, MDOT, and GLWA are therefore persons in violation of an effluent standard or limitation under the Act.

   ### *Citizen Suit under §1365(b).*

52. Section 1365(b) provides: "…any citizen may commence a civil action on his own behalf-- against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this Act [33 USCS §§ 1251 *et seq*.] which is not discretionary with the Administrator."

53. The Plaintiff contends that the EPA has a non-discretionary duty to order the MDEQ and its permittee, GLWA, to adopt and enforce adequate laws and regulations requiring MDEQ's sister agency, MDOT, to obtain a NPDES permit rather than force constituent cities to assume their Clean Water Act effluent requirements limitations on MDOT's discharge of pollutants into Michigan and national waterways under the Drainage Manual which does not impose on MDOT regulatory effluent limitations and requirements of a point source discharger as required by the Act, and, in the case of Highland Park, for free. Highland Park is compelled to allow MDOT to dump discharges of pollutants into its combined sewer system for free by the Michigan Court of Claims without any agreement, in violation of MDOT's own Drainage Manual and in violation of the Act.

54. The Plaintiff contends that the EPA has a non-discretionary duty to order the MDEQ and its permittee, GLWA, to adopt and enforce adequate laws and regulations requiring MDEQ's sister agency, MDOT, to pay its proportionate share of the costs of treatment of

stormwater runoffs going into Highland Park and other localities, including GLWA's combined sewer systems.

55. The Plaintiff contends that the EPA has a non-discretionary duty to order the MDEQ to require MDOT, a point source discharger, to include in its National Pollutant Discharge Elimination System ("NPDES") permit effluent regulations and limitations required by §§ 301 and 307.  MDOT must also be ordered to pay its fair share of Plaintiff's historic treatment costs outlined in Exhibit H and its share of operations and maintenance costs.

56. The Plaintiff contends that the EPA has a non-discretionary duty to order the GLWA, a NPDES permitee, or to order MDEQ, the delegate of EPA power, to refuse to issue and/or terminate a NPDES permit to GLWA because of, and to order GLWA to cease and desist collection of, *ad valorem* property taxes charged to Highland Park residents in payment of delinquent sewer use fees which violate the mandatory provisions of the Act prohibiting assessment of *ad valorem* property taxes for sewer services.

57. The Plaintiff contends that the EPA has a non-discretionary duty to order GLWA, a NPDES permitee, or to order MDEQ to order GLWA to charge, presently and retroactively, only an objectively reasonable proportionate share of total costs allocated among unmetered users of the GLWA sewer system including City of Detroit itself.

58. The Plaintiff contends that the EPA has a non-discretionary duty to refuse GLWA a NPDES permit if it continues to charge its $1 billion deficit in debt in excess of depreciable capital assets to subscribers, wholesale and retail customers.  GLWA must demonstrate that it has the qualifications to manage this, one of the largest wastewater systems in the U.S., prudently and economically without engaging in a lot of risky,

speculative financial transactions which have nothing to do with running a sewer system and then providing financial statements which cover up its losses.

59.  EPA has a non-discretionary duty to order GLWA to eliminate debt cost pass-through to innocent customers that has no value to the sewer system capital asset base and reduce resulting capital debt pass-through by approximately $1 billion, in accordance with proof of waste and financial mismanagement by Plaintiff.   Imaginary, ephemeral assets comprise debt costs of up to $1 billion (about 1/3 of the outstanding $3.3 billion in debt) which can only be eliminated by writ of mandate from this court ordering EPA to order GLWA to seek protection under Act 436, absent a voluntary restructuring by revenue bond holders.


### III.    JURISDICTION AND VENUE.

60. The Plaintiff's Complaint involves a question of federal law, and jurisdiction is therefore proper with this Court pursuant to 28 U.S.C. §§ 1331, 2201(a), and 2202.

61. The Plaintiff's Complaint arises under the citizen suit provision of the Clean Water Act, 33 U.S.C. §1365(a).

62. 33 U.S.C. § 1365(a)(1) grants this Court jurisdiction over suits against any person who is alleged to be in violation of an effluent standard or limitation under the Act [33 USCS §§ 1251].  Defendants MDEQ, MDOT, and GLWA are "persons" as defined in the Act under §1365(a)(1).

63.  33 U.S.C. § 1365(a)(2) grants this court jurisdiction to order the Administrator of EPA to perform any act or duty under the Act, which is a non-discretionary duty to be performed by the Administrator.

64. 33 U.S.C. § 1319 requires the Administrator of EPA to perform specific non-discretionary duties regarding state environmental programs.

65. 33 U.S.C. § 1342 also requires the Administrator of EPA to perform specific non-discretionary duties regarding state environmental programs.

66. As a jurisdictional prerequisite to filing this lawsuit, and in compliance with 33 U.S.C. § 1365(b), the plaintiff has given notice to EPA and the Administrator of the failure of EPA and the Administrator to perform non-discretionary duties. (Attached hereto and marked as Exhibit O is a copy of the notice letter sent by the Plaintiff to GLWA, the State of Michigan, EPA and the Administrator.) Exhibit U is a copy of the GLWA response and Plaintiff's response to GLWA.

67. A favorable decision of this court would redress the failure of EPA and the Administrator to require the State of Michigan and the MDEQ to adopt and enforce adequate and proper laws and regulations for effluent limitations and for the discharge of pollutants by MDOT from state highway conduits of storm waters into navigable waterways of the United States, which has caused the Plaintiff's injury in the form of:

68. (a) increased overcharges from GLWA for MDOT stormwater treatment services (see, *Bennett v. County of Eaton*, 340 Mich. 330 (Mich. 1954) stating: "The principle of law enunciated in the *Tower* Case cannot be construed to give public authorities the right to divert surface water that would in the natural state disperse over a large area, and cast such in concentrated form upon the lands of the abutting owner to his damage without compensation to him."), and

69. (b) a diminution of the citizens of Highland Park's aesthetic, recreational, and environmental use and enjoyment of the affected waterways which are currently under the authority of the State of Michigan and the MDEQ.

70. A favorable decision of this court would redress the failure of the EPA and the Administrator to perform its mandatory duty to require MDEQ to require permittee GLWA to charge a proportionate share of its legitimate operating and capital costs, as defined in §204(b)(1) of the Act, relative to Highland Park's use of sewer services, size, and population.  As shown in Exhibit F, GLWA has overcharged Highland Park, from 2006 to 2014, $17,395,577.33 for sewer treatment services based on size and population. As sourced from public filings of DWSD on the MSRB "EMMA" website in Exhibit C, Highland Park has from 2004 to-date been consistently charged at a sewer billing rate per mcf that is much higher than other wholesale customers. (*See, also* Exhibit D-1) In violation of mandatory requirements of §204(b)(1), as compared to the lowest charge per mcf for another wholesale customer, Highland Park's has been charged 393% more in 2014, 267% more in 2013, 266% more in 2012, 251% more in 2011, 280% more in 2008, 428% more in 2005 and 321% more in 2004 than lowest comparative customer (*Id*., Exhibit C)

71. A favorable decision of this court will redress Defendants' failure to institute a system of user charges that reflects the poverty levels (as defined by federal guidelines) which persist in Highland Park as contemplated by the Act.

72. A favorable decision by this Court would redress the Plaintiff's injuries caused by the failure of EPA and the Administrator to perform the non-discretionary duties of requiring

that the State of Michigan be in compliance with  33 U.S.C. §301, 33 U.S.C. §1319 and 33 U.S.C. §1342 of the Act.

73. A favorable decision by this court will compel EPA to order that sewer fees be reduced to be commensurate with debt paid for actual capital costs, as opposed to financial swap derivatives fees that provide no depreciable capital, hard assets that benefit subscribers, and wholesale and retail customers.

74. Venue lies in this district under 33 U.S.C. § 1365(c) and 28 U.S.C. § 1391(e).

**IV. PARTIES.**

75. At all times relevant to this Complaint, Plaintiff, City of Highland Park ("Highland Park" or "Plaintiff"), was a municipality, a home rule city incorporated pursuant to Chapter 117 of the Compiled Laws of the State of Michigan, located in Wayne County, State of Michigan, and a citizen for purposes of 33 USCS § 1365.

76. At all times relevant to this Complaint, Defendant, EPA, its Administrator and EPA Region 5 Administrator (collectively "EPA" or "Defendant"), represent the Federal Department which has the duty to enforce the Act which makes it unlawful to discharge any pollutant from a point source into navigable waters, unless a permit authorized under the Act was obtained.

77. At all times relevant to this Complaint, Defendant, State of Michigan Department of Environmental Quality ("MDEQ" or "Defendant"), is or was a department of the State of Michigan that is a State water pollution control agency under §502(1) of the Act, that has responsibility for processing NPDES permits under the authority of the Federal Water Pollution Control Act and Part 31 of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended. The purpose of this permit is to control the discharge of

pollutants into surface waters of the state to protect the environment.  MDEQ has failed to enforce the NPDES permit requirements of the Act against its sister agency MDOT, and has failed to require GLWA to impose charges on its wholesale customers proportionately based upon use and to disallow charges for defaults of the City of Detroit resulting in swap termination and acceleration fees.

78. At all times relevant to this Complaint, Defendant, State of Michigan Department of Transportation ("MDOT" or "Defendant"),  is or was a department of the State of Michigan created by the act of and recipient of appropriations by the Michigan Legislature, and a state agency pursuant to MCL 600.6401, *et seq*. MDOT has discharged and is continuing to discharge, without any payment to Highland Park for the collection and treatment thereof,  rain water and stormwater runoffs of freeways and roadways maintained by MDOT that traverse or are next to Highland Park city limits, or otherwise have a nexus with the Highland Park sewer system (hereinafter referred to as the "MDOT Stormwater Pollution Discharges").

79. At all times herein mentioned, MDOT was a governmental agency responsible for the construction, maintenance, and operation of nearly 10,000 miles of state highways and more than 4,000 state highway bridges which are point sources of discharges of pollutants, including toxic pollutants into local navigable waterways under Section 502 (14), (12), (13) and (7), respectively. Two or more state highways which are point sources of discharges of pollutants are located in, next to, or otherwise having a nexus to Highland Park as defined in MCL 691.1401(e) (collectively "state highways"). Such state highways are discernible, confined and discrete conveyances, including but not limited to impermeable channels, tunnels, conduits, and/or discrete fissures, from which stormwater

containing pollutants are or may be discharged. MDOT is therefore a point source discharger that requires a permit even for a portion of its discharges that go into a treatment system.

80. Such pollutants include, or may include, without limitation, Particulates, including pavement wear from vehicles, the atmosphere and maintenance activities, snow/ice abrasiveness and sediment disturbance, rubber tire wear; Asbestos from clutch and brake lining wear; Nitrogen and Phosphorus from atmosphere, roadside fertilizer application and sediments; Lead from leaded gasoline from auto exhaust, tire wear, lubricating oil and grease, bearing wear and atmospheric fallout; Zinc from tire wear, motor oil and grease; Iron from auto body rust, steel highway structures such as bridges and guardrails and moving engine parts; Copper from metal plating, bearing and bushing wear, moving engine parts, brake lining wear; Fungicides and Insecticides; Cadmium from tire wear and insecticide application; Chromium from metal plating, moving engine parts and brake lining wear; Nickel from diesel fuel and gasoline, lubricating oil, metal plating, bushing wear, brake lining wear and asphalt paving; Manganese from moving engine parts; Cyanide from anti-caking compounds used to keep deicing salt granular; Sodium and Calcium deicing salts and grease; Chloride deicing salts; Sulfates from roadway beds, fuel and deicing salts; Bromide from Exhaust Petroleum Spills, leaks, antifreeze and hydraulic fluids, asphalt surface leachate and blow-by motor lubricants; PCBs and Pesticides Spraying of highway right-of-ways; atmospheric deposits and PCB catalyst in synthetic tires; Pathogenic Bacteria from soil litter, bird droppings and trucks hauling livestock/stockyard waste. EPA has a non-discretionary duty to have MDOT effluent pre-

tested for oil and gas and other toxic pollutants and to put into place a pretreatment program is necessary.

81. As all times herein mentioned, Defendant MDOT was in violation of Section 10c of MCL 247.660c, where the Legislature defined maintenance to mean: "... routine maintenance and preventive maintenance, or both" and under routine maintenance, Section 10c (n)(xi) states: "....and associated drainage," and under preventive maintenance, Section 10c (o)(xii) states: "Restoration of drainage" under which statutory provisions it may be concluded that MDOT has the legal responsibility to pay Highland Park for the treatment costs of drainage and cost of restoration of drainage of State trunklines which pour pollutants into Highland Park's sewer system. MDOT clearly has the legal authority and duty under State law to pay its proportionate share of stormwater drainage treatment costs.

82. At all times herein mentioned, Defendant GLWA and its predecessor, City of Detroit Water and Sewerage Department, were holders of a NPDES permit issued by MDEQ which failed to follow the Clean Water Law by, among other things, overcharging Highland Park at a rate much higher than ordered by Judge Feikens in the 1996 consent decree which provided Detroit would be paid 65% of the amount collected from a combined water rate of 12.05 kcf and sewer rate of 22.66 kcf. This consent decree is set forth in Exhibit D. As set forth in Exhibit F above, the amount Highland Park was overcharged from 2006 to 2014 is equal to $17,395,577 and from 2005 to 2015 is equal to $22,576,844.27 (Exhibit D-1)

83. Under cost-of-service principles as required by Michigan law (see MCL 141.118 and the Federal User Charge Regulations, 40 CFR 35.929 *et seq*. and 40 CFR 35.2140 *et seq*.

28

through Dec. 19, 2014), and under CWA §301, each of MDOT and Wayne County must pay its proportionate share of the cost of operating and maintaining the Highland Park sewer system. On April 28, 2015, Kirk L. Steudle, the MDOT director, notified the City of Highland Park's general counsel, Perkins Law Group, that MDOT was refusing to pay Past Due MDOT fees prior to April 10, 2015 (see, Exhibit P). §301b makes it clear that as a point source provider, MDOT has a mandatory duty to have an enforceable agreement and pay its fair share of sewer treatment and O&M costs to Highland Park.

84. MCLS § 141.118 of the Michigan Revenue Bond Act provide, in relevant part: "…free service shall not be furnished by a public improvement to a person, firm, or corporation, public or private, or to a public agency or instrumentality;" and pursuant to Section 204(b) of the Act, MDOT is required to pay for stormwater runoff sewer treatment services "in proportion to the use of the treatment works..."; and GLWA has failed to enforce the Act to require payment from MDOT, a major industrial/transportation user of treatment services.

85. GLWA, in violation of the City Charter, the Michigan Revenue Bond Act, the Clean Water Act, and the Agreement have imposed an *ad valorem* property tax on the citizens of Highland Park who own residential and commercial property and who have been forced to pay the costs of treatment of stormwater runoffs--required for the past 30 years for the safety of persons using the freeways maintained by MDOT--as *ad valorem* taxes, as recently ruled by Judge Murphy in Detroit's and DWSD's suit against Highland Park, while MDOT gets off "scot-free". These taxes have been imposed despite Highland's Park's full satisfaction of all payment obligations outlined in the settlement agreement approved as a part of the consent decree back in 1996.

29

86. In order to get a NPDES permit for a regional sewer system, the permittee must represent that it has the management and technical skills to properly manage a wastewater treatment system. GLWA has failed to disclose to the EPA, MDEQ, Highland Park and other subscribers and wholesale and suburban customers and retail customers that about $1 billion on about 1/3 of the 30-40% of the sewer bill for debt load is being falsely charged as capital costs when the $1 billion in actuality represents forward starting swap termination fees and other swap acceleration fees and losses from non-capital or non-depreciable asset expenditures which are non-operating costs having no benefit to the sewer user base and which should either be paid by City of Detroit or the State, who caused the swap spread acceleration or through a reduction of debt in a Chapter 9 bankruptcy proceeding because the proper characterization of these non-operating expenditures puts GLWA in a deficit position under State law.

87. As a result of their 1989 Agreement (Exhibit G), MDOT and DWSD knew and willfully withheld from Highland Park the overbilling by DWSD of the amount due from MDOT to Highland Park for MDOT's Stormwater Services (1) paid in full by Highland Park to DWSD pursuant to their 1996 Settlement Agreement and (2) owed in part since 1996 and now charged to Highland Park's property owners as a property tax equal to 16 times the current tax assessment based on such owners assessed value. (Exhibit A).

88. GLWA, as successor to DWSD, allows MDOT to pay for stormwater runoff costs annually to DWSD, up to the Highland Park City limits, for the same freeways and roadways that also pour stormwater runoff into Highland Park's combined sewer system at a rate that does not compensate GLWA for the share of costs used by MDOT in

treatment services and the environmental cost of sending untreated CSOs from MDOT stormwater into the navigable waterways of this State.

89. MDOT's nonpayment, with knowledge and active concealment of MDOT and GLWA, took advantage of free Stormwater Runoff Treatment Services, the costs of which have pushed Highland Park to the brink of financial ruin and are now being charged against its citizens as *ad valorem* taxes even though Highland Park has paid the full amount of its consent decree settlement.

90. MDOT has received a subsidy from the citizens of Highland Park in excess of $10 million, plus interest, and MDOT's share of unpaid OM costs, which is about half of  the Judgment against the City now certified to be placed on the tax rolls, with interest, of $30 million.

91. MDEQ knew MDOT was getting a "free ride" on the costs of Stormwater Runoff Treatment Services once MDOT roadways or freeways entered Highland Park from Detroit and continued back into Detroit because MDOT paid Detroit right up to the Highland Park border and concealed its obligation to pay Past Due MDOT Fees due for Stormwater runoff (see, *Bennett v. County of Eaton*, 340 Mich. 330 (Mich. 1954) overruling and distinguishing *Tower vs. Township of Somerset*, 143 Mich. 195, 201 cited on page 10 of MDOT's Drainage Manual stating: "The principle of law enunciated in the *Tower* Case cannot be construed to give public authorities the right to divert surface water that would in the natural state disperse over a large area, and cast such in concentrated form upon the lands of the abutting owner to his damage without compensation to him.").

## V.      OTHER RELEVANT FACTS.

92. On March 3, 2014, Detroit filed suit against Highland Park claiming $18 million in past

    due sewer fees. The Complaint claimed that a contract settlement agreement from 1996

    required Highland Park to pay 65% of a designated amount to be collected from water

    users who bought water from Highland Park's water plant. The Complaint did not allege

    that Highland Park had been charged a proportionate share for sewer services as

    proscribed by the Act.

93.  From 1990 until 2014, the City's population has declined as follows:

| | | |
|---|---|---|
| 1990 | 20,121 | 27.9% |
| 2000 | 16,746 | 16.8% |
| 2010 | 11,776 | 29.7% |
| Est. 2014 | 10,375 | 1.9% |

94. Per the U.S. Census, the number of households in 2013 was 4,534, and the MHI was $

    18,981. Because 70% of the billings generally go to household accounts, the 2014 billing

    was $6,887,428. The sewer fee charged in 2014 is 8.4% of MHI (Exhibit F). The upper

    end of reasonableness for a sewer fee is 2% of MHI.

95. As stated in the EPA's "Combined Sewer Final Overflows Guidance for Financial

    Capability Assessment and Schedule Development," dated  February  1997, page  19,

    Exhibit Q)

    …To assess the financial impact CSO controls may have on the permitee residential

    users. The Residential Indicator is compared to the financial impact ranges that reflect

    EPA's previous experience with water pollution control programs. These ranges are as

    follows:

| Financial Impact | Residential Indicator (CPH as % MHI) |
|---|---|
| Low | Less than 1.0 Percent of MHI |
| Mid-Range | 1.0 - 2. Q Percent of MHI |
| High | Greater than 2.0 Percent of MHI" |

96. As shown in the chart below, over the last eight years, the sewer fee per capita for

Highland Park residents has tripled-from $222 per capita in 2006 to $663 per capita in

2014.

(Source: DWSD)

| YEAR | POPULATION | ANNUAL CHARGES PER CAPITA | DWSD SEWER FEES (Source: DWSD) |
|---|---|---|---|
| 2006 | 15,161 | 3,370,616 | 222.32 |
| 2007 | 14,644 | 3,666,450 | 250.37 |
| 2008 | 14,133 | 4,363.746 | 308.76 |
| 2009 | 13,850 | 4,438,562 | 320.47 |
| 2010 | 11,674 | 3,965,206 | 339.66 |
| 2011 | 11,315 | 4,497,397 | 397.47 |
| 2012 | 10,942 | 4,840,249 | 442.36 |
| 2013 | 10,463 | 5,007,724 | 478.61 |
| 2014 | 10,375 | 6,887,428 | 663.85 |

Source: Column l, Population U.S. Census; Column 2, Great Lakes Water Authority

(formerly DWSD)


97. In 1993 MDOT acquired the Davison Freeway and widened it with a federal grant. At the

time, MDOT had been paying Detroit for stormwater runoff for the Lodge, I-75 and other

freeways since a l986 Sixth Circuit decision, *City of Detroit v State of Michigan and*

*County of Wayne*, 803 F.2d 1411 (6th Cir. 1986).  However, Detroit continued to bill

Highland Park for stormwater runoff for Davison and all other State-owned freeways.

33

The DWSD failed to follow the requirements of its 1982 sewer agreement to impose on MDOT the same obligation to pay Highland Park. The 1982 Agreement provides, in relevant part, that the board shall:

> Carry out all inspection, surveillance and monitoring procedures necessary to determine, independent of information supplied by Industrial and Commercial Users, compliance or noncompliance with applicable National Pretreatment Standards and other more restrictive requirements as may be imposed by the BOARD,
>
> Carry out all inspection, surveillance and ·monitoring procedures necessary to determine, independent of information supplied by Industrial and Commercial Users, compliance or noncompliance with applicable National Pretreatment Standards and other more restrictive requirements as may be imposed by the BOARD.

98. To be sure, this agreement did not reflect the CWA formula for residential cost for sewer treatment, to wit:

Residential Wastewater Flow Residential Share of Treatment Costs over

Total Costs X  Total Wastewater flow

99. As shown above, although the population and residential wastewater flow of Highland Park continued to decrease, the sewer bill tripled on a per capita basis.

100.     Highland Park's recent engineering studies show that a large percentage of the impervious parts of Highland Park, which is only three square miles, are attributable to the Davison and a minor part of the Lodge Freeways, and various State roads managed by MDOT and Wayne County Michigan.  It is estimated that MDOT is an institutional user contributing between 15% and 25% of the total wastewater flow each year from

stormwater runoff. The Costs of MDOT CSO's were passed along not only to Highland

Park but to other customers of the GLWA.

## VI.    CAUSES OF ACTION.

### A. FIRST CAUSE OF ACTION AGAINST MDEQ, AND MDOT: VIOLATION OF PERMIT REQUIREMENTS OF THE CLEAN WATER ACT.

101.    Plaintiff incorporates by reference the preceding paragraphs as if fully stated in

this cause of action.

102.    The Act makes it illegal to discharge pollutants from a point source to the

navigable waters of the United States except in accordance with a permit. Section 402 of

the Act creates the National Pollutant Discharge Elimination System (NPDES) regulatory

and permitting program.  In Michigan, the EPA has delegated NPDES permitting to

MDEQ.

103.    At all times herein mentioned, MDOT was the State of Michigan governmental

agency responsible for the construction, maintenance and operation of nearly 10,000

miles of state highways and more than 4,000 state highway bridges, including one or

more state highways located in, next to, or otherwise having a nexus to Highland Park as

defined in MCL 691.1401(e) (collectively "state highways").

104.    Such state highways are point sources (33 U.S.C §1362(14) from which

discharges of stormwater containing numerous pollutants as defined in §§1362(6), (13),

(12) and (16) are subject to permitting and regulation by EPA, MDEQ and GLWA, as the

NPDES permit holder. State highways in Highland Park and throughout the State are

discernible, confined and discrete conveyances, including but not limited to channels,

tunnels, conduits, and/or discrete fissures, from which storm waters containing pollutants are or may be discharged. MDOT's managed and owned state highways and bridges have no exemptions from the "point source" definition in the Act.  The only "point source" exemption for stormwater is "agricultural stormwater discharges and return flows from irrigated agriculture." (33 U.S.C.  §1362 (14)).

105.     MDOT's managed and owned state highways and bridges are point sources which have no exemptions from the permit requirements of the Act (33 U.S.C.  §1342 (l)).

106.     The discharge of pollutants by MDOT into navigable waters is particularly severe during rainy seasons producing combined sewer outflows (CSOs) resulting in untreated sewerage flowing into the rivers and navigable waterways proximate to Highland Park in violation of the Act.

107.     MDEQ, EPA and GLWA, as NPDES permit holders, have failed to require MDOT or Wayne County, as point sources for pollutants from its State-managed highways, to obtain a discharge permit required under the Act or to set limits on the amount of various pollutants that MDOT can discharge in a given time.

108.     MDEQ, EPA, and GLWA have further failed to set limits or establish standards for discharge of stormwater by MDOT or Wayne County by allowing MDOT  and Wayne County to impose their putative NPDES permit requirements as a point source dischargers of pollutants on cities and municipalities which are traversed by many of their miles of highways and bridges.  MDOT forces adjoining municipal sewer service providers to  use of a Standard Agreement called a Drainage Manual (See, Exhibit A) under which MDOT is not required to pay its fair share or proportionate share of treatment costs as required by the Act. (See, generally, October 2008 Report by the

National Research Council, "Urban Stormwater Management in the United States" attached as Exhibit V, hereto).

109.     Appendix 2B of the Drainage Manual incorrectly states that state roadways, which are classic catch basins and open pipes and conveyances for stormwater, are "non-point sources" of polluted stormwater. Non-point sources is not defined in the Act but by default is considered to mean any source of water pollution that does not meet the legal definition of "point source" in section 502(14) (33 U.S.C. §1362(14)) of the Clean Water Act.

110.     MDOT state highways in urban areas have curbs, walls or gutters on each side causing stormwater to drain into whatever combined sewer system is adjacent to the state highway and clearly meet the definition of section 502(14).

111.     MDOT is the owner of state highways that EPA failed to require MDEQ and GLWA to develop any plan to collect from MDOT for the portion of the Davison (and small portion of the Lodge) located in Highland Park. The entire billing of DWSD was completely arbitrary, which allowed that wastewater treatment costs of users without water meters like MDOT and Wayne County to avoid paying their proportionate share.

112.     Highland Park is only three square miles, MDOT-controlled roadways are impervious surfaces and represent a major percentage of the total impervious land mass of Highland Park. MDOT is the largest stormwater sewer user in Highland Park, but is allowed by grantee DWSD to get free service paid primarily by residents.  When Highland Park's population continued to decline, and the largest stormwater sewer user, MDOT, was getting free service paid by the declining number of residents.  The sewer bill continued to increase, resulting in loans from Highland Park's general fund, to help

residents pay the MDOT sewer bill. This ultimately resulted in Highland Park's inability to generate sufficient revenue to keep its water plant in good repair, resulting in a financial takeover by the State, and the shutting down of the water plant ordered by the State.

WHEREFORE, Plaintiff Highland Park requests that this Court enjoin EPA and MDEQ from granting further exemptions to MDOT from the requirement to get a NPDES permit, and require by mandate that MDOT pay its proportionate share of the costs of treatment services from 1996 to date from Highland Park under 33 U.S.C. § 1365(a)(1) as violations of an effluent standard or limitation under the Act.

## B.   SECOND CAUSE OF ACTION AGAINST MDOT: TO ENJOIN EACH OF MDOT AND WAYNE COUNTY TO SIGN AN ENFORCEABLE AGREEMENT AND PAY ITS SHARE OF TREATMENT COSTS AS OUTLINED IN EXHIBIT H AND O&M COSTS ACCORDING TO PROOF

113.      Plaintiff incorporates by reference the preceding paragraphs as if fully stated in this cause of action.

114.      Section 301 (b) and (i) of the Act require that MDOT, a point source discharger using the treatment works of Highland Park, pay its fair share of treatment costs and sign an enforceable agreement.

115.      Section 301(b) and (i) of the Act also require payment by MDOT of their fair share of Highland Park's O&M costs.

116.      Section 301(b) and (i) apply in the same manner to Wayne County.

117.      Plaintiff requests that these payments be mandated as a condition to MDOT's NPDES permit which show a 2009 expiration date.  (Exhibit R).

WHEREFORE, Plaintiff requests the this court enjoin MDOT and Wayne county under 33 U.S.C. § 1365(a)(1) for violations of Section 301(b) and (i) which are limitation under the Act  by requiring payments of past due payment amounts as set forth in Exhibit H and future payments for their proportionate share of Highland Park Treatment costs following execution of enforceable agreements in accordance with Section 301 (b) and (i) of the Act.

### C. THIRD CAUSE OF ACTION AGAINST EPA: TO PERFORM ITS MANDATORY DUTY TO ORDER GLWA TO CHARGE HIGHLAND PARK NOT MORE THAN THE PROPORTIONATE SHARE OF COSTS AS PROSCRIBED BY THE 1996 SETLEMENT AGREEMENT APPROVED BY DISTRICT COURT JUDGE FEIKENS.

118.     Plaintiff incorporates by reference the preceding paragraphs as if fully stated in this cause of action.

119.     Judge Murphy's Order (the "Order"), dated July 31, 2014, in Wayne County Circuit Court, granted DWSD a summary judgement based on enforcement of the 1983 agreement and the 1996 court-approved settlement agreement and damages based upon "Account Stated." Judge Murphy held that DWSD could enforce bills or "accounts stated" of $18,197,620.22 and $1,047,218.31 for sewer and water, respectively, with interest. These judgments now approach $30 million (See, Exhibit A)

120.     The account stated legal theory is in direct  conflict with Federal Court consent decree sewer rate payment agreement fixed by paragraph 1(a) of the Settlement Agreement and the further terms of the 1983 agreement which were imposed by paragraph 1(b), to the extent not covered by paragraph 1(a), requiring billing of the MDOT amounts due to Highland Park.  (See, Exhibit O, Exhibit A thereto).

121.     Further GLWA has charged Highland Park significantly more than its proportionate share of sewer system costs under Clean Water Act rules.  Further, the Order did not consider the fact that MDOT and Detroit knew MDOT was getting a "free ride" on the costs of Stormwater Runoff Treatment Services once MDOT roadways or freeways entered Highland Park from Detroit and continued back into Detroit. MDOT paid Detroit right up to the Highland Park border; and concealed its obligation to pay past due MDOT fees due for Stormwater runoff (see, *Bennett v. County of Eaton*, 340 Mich. 330 (Mich. 1954) overruling and distinguishing *Tower vs. Township  of  Somerset*, 143 Mich. 195, 201 cited on page 10 of MDOT's Drainage Manual stating: "The principle of law enunciated in the *Tower* case cannot be construed to give public authorities the right to divert surface water that would in the natural state disperse over a large area, and cast such in concentrated form upon the lands of the abutting owner to his damage without compensation to him.")

122.     GLWA has charged Plaintiff much in excess of its proportionate share of costs as defined in Clean Water Act §204(b)(1) relative to its size and population.

123.     GLWA has failed to institute a system of user charges that reflects the poverty levels (as defined by federal guidelines) which persist in Highland Park as contemplated by the CWA §204(b)(1) and regulation 40 CFR 35.2140.

124.     The Combined Sewer Overflow guidance is a limitation for which a direct suit may be brought by Highland Park against GLWA under 33 USC §1365(a)(1).  Federal CWA preempts the findings of the State Court in this regard. The CWA prohibits GLWA's continued failure to charge MDOT, which obligates Highland Park to much more than its proportionate share of system operations and maintenance costs, and

allowance of MDOT's free service for stormwater discharges of polluted roadway runoff into the combined sewer system resulting from GLWA's billing for these discharges to Highland Park's retail and industrial customers and failure to bill as a separate State governmental stormwater user class.

125.     Exhibit E contains the June 18, 1996, court-ordered Settlement Agreement which provides for a water rate of $12.05 per kcf and $22.65 to be charged to customers. This Settlement Agreement obligates Highland Park to pay 65% of the amount actually received—not to have direct liability to guarantee the payment.  The Settlement Agreement reads "65%   of any and all amounts received by it in payment of bills for water and wastewater treatment services rendered by it to its customers." (See Settlement Agreement pages 6-8).

126.     The Settlement Agreement has no provision for payment of non-metered stormwater flow from MDOT or Wayne County as required by the CWA and the 1983 Agreement. The judgment was erroneously based on "Account Stated" which disregards this Settlement Agreement and unsupportable formulas without any measurements backing up assumed sewer flows from Highland Park which make up the Accounts Stated.  The Erroneous Account Stated includes overcharges not based on any metered flows and not adjusted for failure of GLWA to separately bill for the major stormwater users and has been charged as *ad valorem* taxes in violation of Exhibit B hereto. WHEREFORE, Plaintiff prays the partial summary judgment and rulings of Judge Murphy be declared void and of no effect in violation of the Act and that GLWA be enjoined to follow the consent decree issued by Judge Feikens and comply with other provisions of the Act violated by the Order.

**D.**   **FOURTH CAUSE OF ACTION AGAINST EPA: TO PERFORM ITS MANDATORY DUTY TO ORDER THE STATE OF MICHIGAN DEPARTMENT OF ENVIRONMENTAL QUALITY TO ADOPT AND ENFORCE ADEQUATE LAWS AND REGULATIONS REQUIRING ITS SISTER AGENCY, MICHIGAN DEPARTMENT OF TRANSPORTATION ("MDOT"), AND WAYNE COUNTY, TO PAY THEIR PROPORTIONATE SHARE OF THE COSTS OF STORMWATER RUNOFFS GOING INTO THE HIGHLAND PARK'S AND OTHER LOCAL COMBINED SEWER SYSTEMS.**

127.    Plaintiff incorporates by reference the preceding paragraphs as if fully stated in this cause of action.

128.    Plaintiff contends that the EPA has a non-discretionary duty to order the State of Michigan Department of Environmental Quality to:

a.    adopt and enforce adequate laws and regulations requiring its sister agency, MDOT, and Wayne County to pay their respective proportionate share of the costs of Stormwater runoffs going into the Highland Park and other local combined sewer systems; and

b.    Require MDOT and Wayne County to acquire a National Pollutant Discharge Elimination System ("NPDES") permit because they are point sources of stormwater discharges from their miles of roadways which traverse many different communities.

WHEREFORE, Plaintiff hereby requests the EPA to order:

1.    MDOT to pay its proportionate share of costs incurred by Highland Park in maintenance of the combined sewer systems used by the State MDOT since 1989. This includes $10, 753,783 PLUS costs of deferred maintenance, interest, and other shared costs according to proof. (See, Exhibit H).

42

2.    Wayne County to pay its proportionate share of costs incurred by

Highland Park in maintenance of the combined sewer systems used by Wayne County.

This includes $3,236,671 PLUS costs of deferred maintenance, interest, and other shared

costs according to proof. (See, Exhibit H).

**E.    FIFTH CAUSE OF ACTION AGAINST EPA: TO PERFORM ITS MANDATORY DUTY TO ORDER THE GREAT LAKES WATER AUTHORITY TO CEASE AND DESIST COLLECTION OF PROPERTY TAXES FROM THE RESIDENTS OF HIGHLAND PARK WHICH VIOLATE THE MANDATORY PROVISIONS OF THE CLEAN WATER ACT PROHIBITING ASSESSMENT OF AD VAOREM PROPERTY TAXES FOR SEWER SERVICES.**

129.    Plaintiff incorporates by reference the preceding paragraphs as if fully stated in

this cause of action.

130.    The EPA has a mandatory duty to order GLWA, a NPDES permitee, to:

a.    cease and desist collection of property taxes from Highland Park residents

in payment of delinquent sewer use fees which violate the mandatory provisions of the

Clean Water Act prohibiting assessment of property taxes for sewer services, and

b.    charge, presently and retroactively, only an objectively reasonable

proportionate share of total costs allocated among unmetered users of the GLWA sewer

system.

131.    The EPA has a non-discretionary duty to make sure GLWA has legal,

institutional, managerial, and financial capability to insure adequate construction,

operation, and maintenance of treatment works throughout GLWA's jurisdiction, as

determined by the Administrator. EPA has violated this duty by allowing GLWA to

impose *ad valorem* taxes on the customer base of Highland Park and by allowing GLWA

to impose a system of charges which results in the distribution of operation and

maintenance costs for treatment works within GLWA's jurisdiction, which does not

impose on each user class, including large stormwater producers like MDOT, in

proportion to the contribution to the total cost of operation and maintenance of such

works by each user class (taking into account total waste water loading of such works, the

constituent elements of the wastes, and other appropriate factors).

132.    Highland Park is a debtor of GLWA only because it has been charged more than

its proportionate share and MDOT has been charged less than its proportionate share.

What is confounding is that GLWA does not express the same amount of outrage against

MDOT for failing to pay its subscriber Highland Park, as it did in 1986 when it sued

MDOT for not paying DWSD for stormwater services.  DWSD has known since1986 that

it has been charging Highland Park for stormwater treatment services provided to MDOT

and that MDOT has been receiving free service. The total amount of the free service

estimated at $10,753,783 plus O&M and interest and the overcharges by GLWA of $22

million will set off the amount of the judgment of $19 million that is now on appeal. The

amount of free service given to Wayne County is $3.323.671. Allowing MDOT and

Wayne County to not pay while putting MDOT's stormwater bill to Highland Park on the

*ad valorem* tax rolls as of one of the poorest cities in Michigan is the height of

environmental injustice. GLWA putting the "account stated" bills on the Highland Park

*ad valorem* tax rolls is also in violation of §1284(b), since these taxes were not in place

before 1977. (See, *Middlesex County Utilities Authority v. Sayreville*, 690 F.2d 358 (3d

Cir. N.J. 1982))

133.    GLWA's placement of sewer charges on *ad valorem* tax rolls and failure to

require MDOT to pay its proportionate share as a major stormwater user class are

fundamental violations of Highland Park's rights under the CWA. (See e.g. *Natural Resources Defense Council, Inc. v. United States EPA*, 966 F.2d 1292 (9th Cir. 1992))

134.      Highland Park has presented the empirical data showing Highland Park is not paying its proportionate share. (Exhibit C, F, H) This data is not countermanded and shows a direct violation of § 1284(b).

135.      GLWA has failed, and continues to fail, as required under the CWA, to establish a user class in its bill to Highland Park for major governmental stormwater runoff producers. Highland Park initially brought its third party claims that MDOT owed most of the $19 million claimed by DWSD in Judge Murphy's court. DWSD filed to dismiss these third party claims, in bad faith.

136.      Under the user charge provisions of the Act, the EPA administrator "shall not approve a grant . . . unless he shall first have determined that the applicant (A) has adopted or will adopt a system of charges to assure that each recipient of waste treatment services within the applicant's jurisdiction, as determined by the Administrator, will pay its proportionate share (except as other-wise provided in this paragraph) of the costs of operation and maintenance (including replacement) of any waste treatment services provided by the applicant." 33 U.S.C. § 1284(b)(1) (Supp.1982) (hereinafter referred to as "section 204(b)(1)").

137.      The EPA regulations specify what requirements a user charge system must meet in order to satisfy section 204(b)(1).  In general, the user charge system proposed by a grantee such as the MCUA must, in order to meet approval, ensure that "each user . . . pays its proportionate share of operation and maintenance (including replacement) costs

of treatment works within the grantee's service area, based on the user's proportionate contribution to the total waste water loading from all users. . . ." 40 C.F.R. § 35.929-1(a).

138.　　　Moreover, in the case of a "regional treatment system accepting wastewaters from other municipalities," such as the GLWA, "the subscribers receiving waste treatment services from the grantee shall adopt user charge systems in accordance with section 204(b)(1)(A) of the Act [quoted above] and §§ 35.929 through 35.929-3" of the regulations. *Id.* EPA, MDEQ and GLWA cannot turn a blind eye to free service provided to major dischargers whether industrial or governmental.

WHEREFORE, Plaintiff's ask the court to enforce EPA's non-discretionary duty to require GLWA/DWSD to adopt a user charge system that require large dischargers of pollutants like MDOT and Wayne County to pay their proportionate share of costs of subscribers like Highland Park and to require GLWA to bill Highland Park only its proportionate share of costs of capital facilities based on actual use of the GLWA sewer system and without the pass through of costs of financial waste and mismanagement by the City of Detroit.

**F.　　SIXTH CAUSE OF ACTION AGAINST EPA:　TO PERFORM ITS MANDATORY DUTY TO ORDER THE GREAT LAKES WATER AUTHORITY TO REDUCE CHARGES FOR SEWER SERVICES SO SEWER SUBSCRIBERS, AND WHOLESALE AND RETAIL SEWER CUSTOMERS ARE NOT PAYING THE FINANCIAL DISTRESS COSTS OF THE CITY OF DETROIT WHICH TRIGGERED SWAP ACCELERATION AND TERMINATION FEES HAVING NO BENEFIT TO USERS.**

139.　　　Section 1284(b) provides that the Administrator shall not make a grant to GLWA unless it determines that the recipient "has legal, institutional, managerial, and financial capability to insure adequate construction, operation, and maintenance of treatment works throughout the applicant's jurisdiction, as determined by the Administrator." Highland

Park's sewer charges are over 10% of Median Household Income and Highland Park is subsidizing the treatment costs of MDOT and Wayne county –huge stormwater dischargers. (Exhibit F)

140.　　If you look at the GLWA Sewer Department financial statements, the mismanagement leading to unconscionably high costs is obvious. In December 2011 over $310 million in swap acceleration fees on Detroit Sewer Fund interest rate swaps and forward starting swaps were triggered when Gov. Rick Snyder appointed a fiscal review board to begin to investigate Detroit's finances.　On June 30, 2012, DWSD issued $659 million in senior lien revenue bonds where the bulk of the proceeds were used to pay these swap acceleration fees.　The net result is that the amount of debt being passed along to wholesale users from swap acceleration fees caused by a default related to the governor's appointment of a fiscal review board for the City of Detroit--which did not add any value to the DWSD capital plant benefitting sewer users or wholesale customers--was charged in increased sewer fees and misrepresented as capital costs.

141.　　The DWSD audited balance sheets for comparison from 2005 and 2014 show the net capital depreciable assets less long term revenue bond fixed liabilities in 2005 was a positive $338,447,314, and by 2014 the net capital depreciable assets less long term revenue bonds was a negative ($711,172,334).　In the 2014 audit, the auditor, KPMG, tried to cover up the fact that debt was now greater than depreciable capital assets by taking out the line item from 2005 "invested in capital assets, net of related debt" and by adding a new accounting line item "Assets not subject to depreciation" to cover up the fact that bond proceeds had been used to pay operating costs from swap acceleration fees caused by City of Detroit financial problems.

142.     In fairness to wholesale [and retail] customers these non–operating expense swap acceleration fees caused by the Governor's response to the City of Detroit's financial problems and was included as a debt in the Bankruptcy rather than passed along to wholesale customers.  In the case of Highland Park, the amount of sewer treatment fees which Highland Park was overcharged jumped to $4,542,817, in 2014, from and overcharge of $2,598,396 in 2013--a $2 million increase from costs unrelated to provide sewer treatment services. (See, Exhibit F).  The jump in user fees charged to Highland Park in 2014 to $6,887,428.00 from $5,007,724.00 appears to be directly related to the $600 million bond issue in 2014 the main portion of the proceeds of which were used to pay of the lost bet on interest rates included in the forward swaps purchased by GLWA. This debt which only had a minor portion devoted to replacement of the treatment system are not costs that may legally be charges for services rendered to suburban and wholesale and retail users.

143.     Once the swap fees are properly characterized as non-operating expenses not chargeable to a capital account, GLWA is insolvent. The EPA and MDEQ must order GLWA to properly disclose its wrongful issuance of long-term debt to pay a one-time acceleration or termination fee for forward starting swaps and termination fees and refinancing costs for auction rate securities and associated floating to fixed rate swaps. These fees are not capital facilities of any benefit to customers of the sewer system.  They must be paid either by the City of Detroit, or the State must approve a write down of the debt in a GLWA chapter 9 proceeding.  The EPA has to look at whether GLWA as an insolvent permittee can continue to provide required services to its constituents. WHEREFORE, plaintiff prays that:

This Court mandate that MDOT cease and desist it continued failure to obtain a NPDES permit that covers all discharges including those sent from  point sources controlled by MDOT into municipal treatment works and sent from point sources through pipes of treatment works but untreated or pretreated directly into the rivers without any testing or regulation.

## IV.    GENERAL PRAYER FOR RELIEF

I.    The court mandate that MDOT and Wayne County comply with §301 and pay their respective share of treatment costs to Highland Park and enjoin MDOT and Wayne County to pay to Highland Park sums owed as a point source of discharges of stormwater pollution.

II.    This Court require EPA to perform its mandatory duty to mandate GLWA to charge Highland Park not more than its proportionate share of costs as proscribed by the Act and approved by paragraph 1a and 6 of the 1996 Settlement Agreement approved in a consent order by Judge Feikens.

III.    This Court require EPA to perform its mandatory duty to order the MDEQ to adopt and enforce adequate laws and regulations requiring its sister agency, MDOT, and Wayne County to pay their respective proportionate shares of the costs of stormwater runoffs going into the Highland Park and other local combined sewer systems.

IV.    This Court require EPA to perform its mandatory duty to order the GLWA to cease and desist collection of property taxes from the residents of Highland Park which violate the mandatory provisions of the Clean Water Act prohibiting assessment of *ad valorem* property taxes for sewer services.

49

V.   This Court require EPA to perform to perform its mandatory duty to order the GLWA to reduce charges for sewer services so that sewer subscribers, and wholesale, suburban and retail sewer customers are not paying the financial distress costs of the City of Detroit which triggered swap acceleration and termination fees having no benefit to users or other fiscal mismanagement costs that created a loss of over one billion dollars in capital assets compared to the revenue bond debt outstanding.

VI.   This Court enjoin the EPA from approving any grants to the State of Michigan, MDEQ, MDOT, GLWA, and Wayne County until such entities comply with the proportionate share user charge requirement and demonstrate legal, institutional, managerial, and financial capability to insure adequate construction, operation, and maintenance of treatment works throughout the applicant's jurisdiction.

VII.   The Court dismiss the GLWA State court proceedings against Highland Park with findings consistent with the resolution of the matters prayed for in this case.

VIII.   The Court declare the Judgment entered by Judge Murphy against Highland Park and in favor of GLWA void and of no effect in violation of the Act.

IX.   The court award Plaintiff its costs of suit.

X.   The Court grant such other relief as it deems appropriate under the circumstances of this case and in the equity powers of this court.

Respectfully submitted this 28th day of October 2016.

/s/William R. Ford
WILLIAM R. FORD (P35870)
Attorney for Plaintiff
Ford Law Firm
613 Abbott St., 1st Floor
Detroit, Michigan 48226
(248) 790-6812
fordattyford@aol.com

/s/Calvin B. Grigsby
CALVIN B. GRIGSBY (Cal. Bar No. 53655)
Attorney for Plaintiff
2406 Saddleback Drive
Danville CA 94506
(415)860-6446
cgrigsby@grigsbyinc.com