**Appendix 2-D**

**Roads and County Drains Guideline**

# Table of Contents

|  | **Page** |
|---|---|
| Summary | 2-D-4 |
| Introduction | 2-D-4 |
| Acknowledgments | 2-D-5 |
| Historical Perspective of Drainage In Michigan and Drain Law | 2-D-7 |
| In the Beginning | 2-D-7 |
| Evolution of Drainage Laws | 2-D-8 |
| Territorial Laws | 2-D-8 |
| Statutory Drainage Rights Following Statehood (1837) | 2-D-10 |
| MDOT'S Authority Over Drainage and State Trunklines | 2-D-14 |
| Roads and the Drain Code of 1956 | 2-D-15 |
| Michigan Drain Code Procedures for Establishment of a Drainage District and Implementation of a Drain Project | 2-D-17 |
| Step 1 - Construction of Intracounty, Intercounty, and Public Health Drains | 2-D-17 |
| Step 2 - Filing the Application - Lay Out and Designate a Drainage District | 2-D-18 |
| Step 3 - Order Designating Drainage District - Sufficiency | 2-D-21 |
| Step 4 - Filing the Petition to Locate, Establish, and Construct | 2-D-21 |
| Step 5 - Board of Determination, Practicability and Necessity | 2-D-23 |
| MDOT Response to Notice and Order | 2-D-23 |
| Step 6 - Approval of Drain Plans and Specifications - Design Phase | 2-D-25 |
| MDOT Construction Permit | 2-D-25 |
| Step 7 - Final Order of Determination or Apportionment | 2-D-26 |
| Step 8 - Notice of Apportionment and Day of Review | 2-D-26 |
| Step 9 - MDOT Objection to Apportionment | 2-D-29 |
| Step 10 - Review of MDOT Objection by MDA | 2-D-29 |
| Step 11 - No Objection - MDOT Initial Assessment Review | 2-D-30 |
| Final Project Review and MDOT Construction Permit | 2-D-30 |
| Agreements | 2-D-31 |

|                                                              | **Page** |
| ------------------------------------------------------------ | -------- |
| Maintenance of County Drains                                 | 2-D-32   |
|     Maintenance – Petition                                   | 2-D-33   |
|     Procedure and Apportionment                              | 2-D-34   |
|     Drains Necessary for Public Health - Chapters 20 and 21  | 2-D-36   |
|     Payment of Drain Assessments                             | 2-D-37   |
| Section 14A of Act 51 and its Administrative Rules           | 2-D-39   |

**ATTACHMENTS (updated January 2004)**

| A | MDOT Drainage Coordinators                                 | 2-D-44 |
| B | MDOT Drainage Coordination Responsibilities               | 2-D-45 |
| C | Michigan Drain Code Procedures                            | 2-D-49 |
| D | Administrative Rules                                       | 2-D-51 |
| E | Act 51 vs. The Drain Code on the "Benefit" Standard        | 2-D-59 |
|   |     Conflict and Controversy                             |        |
|   |     Drain Code: "Benefits" Standard                      |        |
|   |     Act 51 Section 14A, "Benefits" Equal Pro Rata Share  |        |
|   |     Section 14A of Act 51 - Pro Rata Share               |        |
|   |     Act 40 (Drain Code) and Act 51 (Highway Law)         |        |

## SUMMARY

An understanding of requirements imposed by Michigan's Drain Code and the manner in which drainage assessments are apportioned and reviewed is basic for cooperation between the Office of the County Drain Commissioner and the Michigan Department of Transportation (MDOT or the Department). Information contained in this guideline should assist in that understanding for MDOT staff on the coordination with county drain projects that affect State trunklines. Also, the coordination of MDOT's construction program with approximately 5,000 individual county drainage districts in Michigan needs to be facilitated by MDOT's Drainage Coordinator and the Region/TSC staff.

For MDOT to respond in a timely manner to a request from the Drain Commissioner for financial participation in a county drain project, MDOT's Drainage Coordinator, Drainage Engineer, and Regional Drainage Coordinator must be contacted early and be involved in the county drain project design process. Such projects, whether for construction or maintenance, require notification to MDOT of the petition initiating a project.

Essential to the Department's financial participation in county drain projects are:

- Confirmation that the Department's drainage apportionment percentage is based upon Section 14a of Act 51 (Attachment E), MCL 247.664a, and the promulgated Administrative Rules R 280.1 – R 280.9. The Drainage Coordinator will also provide written notice of acceptance or objection to a drain assessment as outlined in Section 154(4) of the Drain Code, MCL 280.154.

- Documentation supporting the drainage apportionment percentage, and any agreed-to additional costs based either on supplemental benefits or agreements made, must be coordinated with the MDOT Drainage Coordinator.

- MDOT's Regional/TSC Utilities - Permit Engineer will, in a timely manner, provide the Drain Commissioner with the construction, specifications, and permit requirements for the project as it relates to the State trunkline.

## INTRODUCTION

This guideline is based on the interactions of MDOT personnel with the Michigan Department of Agriculture's Environmental Stewardship Division, the Michigan Department of Environmental Quality's Geological and Land Management Division, and members of the Michigan Association of County Drain Commissioners.

For those interested in drainage in Michigan and its relationship with the development of Michigan's road system and State highways, this guideline presents a better understanding of the historical perspective of where our drainage responsibilities lie, as well as the legislative and judicial impact on drainage rights and regulations. Most significantly, this guideline relates the equitable and enduring system for allocating costs of constructing and maintaining the extensive system of county drains.

This guideline first provides a historical perspective on how drainage issues and laws evolved in Michigan. This evolution started from a loose-knit set of territorial drainage writs, to a statutory drain code encompassing township, county, and State involvement in the important issue of providing adequate drainage for our agricultural, industrial, and community activities, and the development of Michigan's road system. It is imperative for those involved in the task of either providing or seeking access to drainage to have, at the very minimum, a cursory knowledge of drainage laws and regulations.

A discussion of MDOT's authority over the State trunkline system is described. Importantly, it is shown that the authority also implies responsibility that extends all the way to providing adequate drainage for the road system.

The guideline lays out the procedural process for establishing a drainage district, locating and constructing a drain, and the maintenance of that system. This guideline will provide the reader with an understanding of the legal and procedural process necessary for implementation of county drainage projects involving roads. Those chapters of Michigan's Drain Code of particular interest to MDOT are highlighted in that procedural process. A flowchart laying out the step in each process is attached (Attachment C).

The manner and method that MDOT uses to analyze, document, and compute drainage apportionments and how MDOT pays its assessment are discussed. Sometimes, this leads to differences of opinion because of the conflicting legislative statutes on determination of benefits and what MDOT can expend on drain projects. A discussion on legal interpretation is provided in Attachment E on both the Drain Code and MDOT's funding restrictions in Attachment E, titled "Act 51 v.s. the Drain Code on the 'Benefit Standard'." This will frame those differences and develop a better understanding of this issue.

MDOT Drainage Coordinator contacts and their respective responsibilities are outlined in Attachments A and B, respectively.

**ACKNOWLEDGMENTS**

This guideline was developed based on two previous MDOT internal publications. They are:

"Drainage Engineering Manual" MDOT, Bureau of Highways, Engineering Services Division, dated April 4, 1995, and

"Drainage Assessment Guidelines," MDOT, dated September 1990.

Retired MDOT Drainage Coordinator Ross A. Heath authored both publications. The publications were built upon Mr. Heath's 12 years of contributions and experiences with the various Drain Commissioners in Michigan's 83 counties. There exists a close relationship between the users (roads) and the overseers of the county drain system.

These previous publications could not have been completed without the creative input and review provided by Michael R. Gregg of the Michigan Department of Agriculture's Environmental Stewardship Division. Much of the historical, as well as statutory, documentation of drainage events that is discussed in this current guideline can be found in Mr. Gregg's Master of Science Thesis titled: "The Nature of Land Drainage Interdependence in Michigan."

## HISTORICAL PERSPECTIVE OF DRAINAGE IN MICHIGAN AND DRAIN LAW

### IN THE BEGINNING

Michigan's topographic relief and its natural drainage patterns were determined during the last glacial period which ended about 10,000 years ago. In places, the State was covered with ice, boulders, and various materials to a depth of two to three miles. Those land forms, which existed prior to that time, were completely altered as the glacier advanced across Michigan. Not only were the weathered materials which formed the soils of the State removed, but up to 1,000 feet of glacial debris was deposited as the ice sheet receded.

Glaciation created moraine ridges and eskers, usually of sand and gravel. Drumlins, kames, and ancient lake beaches, once wave swept, now many miles inland, were produced at the same time as deposits of lake clay and sandy outwashes. Depressions were also produced where surface water accumulated and formed marshes, swamps, lakes, and soils with varying degrees of moisture.

The swamps and other wetland areas of Michigan's geological land surface caused the State to be considered the fifth wettest in the Union. Early reports showed Michigan with 12 percent of the Lower Peninsula and 25 percent of the Upper Peninsula covered by swamps and/or lakes. This amounted to an area of 14 million acres. As large as these figures were, they did not tell the whole story. Extensive areas, which may have been wet for a good part of the year, such as those having heavy clay soils, were not included.

Dr. Willis F. Dunbar, in his well-known book, "*Michigan: A History of the Wolverine State*," documented quite well the difficulties wetlands presented to the State's original settlers. Dr. Dunbar reported that even though Michigan lands had been cleared of Indian title, surveyed, and made available for purchase from the government land office by 1818, the amount of land sold was minimal. There had been adverse reports concerning the quality of Michigan, and there were doubts concerning health conditions. In 1814, General Duncan MacArthur, who was stationed in Detroit, wrote William Woolbridge, who was considering whether to accept an appointment as Secretary of the Territory:

> "...I have no hesitation to say that it would be to the advantage of government to remove every inhabitant of the Territory, pay for the improvements, and reduce them to ashes, leaving nothing but the Garrison posts. From my observation, the Territory appears to be not worth defending, and merely a den for Indians and traitors. The banks of the Detroit River are handsome, but nine-tenths of the land of the Territory is unfit for cultivation..."

Another disparaging report about Michigan came from Edward Tiffin, Surveyor General of the United States. Congress had enacted a law, which provided that two million acres of land were to be awarded to veterans of the War of 1812. Tiffin sent surveyors north

from Defiance, Ohio into the southeastern part of the Territory of Michigan in 1815 to see whether the land was suitable; their report to Tiffin was unfavorable. He, in turn, reported that Michigan apparently consisted of swamps, lakes, and poor sandy soil not worth the cost of surveying. He declared that, in his opinion, not more than one acre in 100, or perhaps 1,000, would admit to cultivation. Congress, as a result, designated land in Illinois and Missouri for the veterans.

Since those early settlement days, more than half the State's original wetland acreage has been converted to other uses. Thousands of acres of wetlands continue to be drained and filled yearly for industrial, commercial, residential, and recreational purposes. Unfortunately, a significant amount of this conversion has been completed indiscriminately with little consideration of the cumulative adverse impact on the many values wetlands provide.

## EVOLUTION OF DRAINAGE LAWS

Statutory rules for modification of natural surface water drainage patterns were first developed when Michigan was still a territory more than 50 years before the courts articulated the common law structure. This fact evidences the State's recognition of the necessity of artificial land drainage and desire to promote its development. Given the limitation under common law for extensive artificial drainage and conflict resolution between two or more parties, much of the surface drainage of water that has been accomplished has been, by rights, established by statute.

## TERRITORIAL LAWS

The first statutory provision for drainage appears in Section 9 of "An Act to Regulate Highways," passed in 1819 (Vol. 1, "Laws of the Territory of Michigan," p. 449). This Act authorized the county commissioners to appoint township highway supervisors and gave them the power to:

> "...cut timber and dig in the highways, and to enter on the lands adjacent to the highways, and to cut, make, cleanse and keep open such gutters, drains and ditches therein as shall be sufficient to convey and draw off the water from said highways, with the least disadvantage to the owner of the land; and the owner and every other person, except the supervisor, is hereby prohibited from filling up, stopping or obstructing such gutter drain or ditch under the penalty of eight dollars, to be recovered by action of debt with costs, by the supervisor before a justice of the peace of the proper county."

These provisions were obviously limited to drainage necessary for roads, and it wasn't until 1827 that provisions for the resolution of land drainage conflicts between two property owners were established in Section 19 of "An Act Relative to the Duties and Privileges of Townships" (Vol. 2, "Laws of the Territory of Michigan," p. 317). In part, Section 19 provided:

"That whenever there are low grounds or swales, rendered unproductive by marshy or stagnant waters, which can be conveniently drained by ditching through one or more forms of adjoining improved lands, similarly situated, so as to render the whole more valuable and productive, or wherever it shall be necessary and useful to have a drain or ditch on the line between two improved farms, to render them more productive, each person interested shall make and maintain a just proportion of the cross ditches or drains."

This language implies that drainage was a mandatory duty between property owners, indicating the value placed on promoting the economic development of land. If conflicts did arise as to respective duties, physical dimensions, location, or necessity, an application was made by any one of the parties, with notice to the other(s) for settlement by "fenceviewers." Fenceviewers were residents of the township selected to resolve various disputes between landowners, including drainage, and their decision was conclusive.

Further, if any person did not maintain their proportion of drainage and after four weeks notice, neglected, or refused to do their part, they became liable for their neighbor's damages, which were determined by fenceviewers and recovered in court. These same provisions appeared in a 1833 Act of the same title, Section 27 (Vol. 3, Laws of the Territory of Michigan, p. 1038).

These three acts clearly demonstrate the pro-development attitude of the territory designed to achieve utilization of the land-based resources necessary to sustain the inhabitants. Individual rights to the land were clearly subservient to the interests of others "so as to render the whole more valuable and productive." This time period was prior to statehood and the objective was to encourage settlement. Given the agrarian economic base of society at this time, settlers were looking for good farmland and their numbers were sought for strength to attain statehood.

This "mandate" for drainage by the territorial laws provides an interesting contrast to the initial interdependence under common law for land drainage in Michigan as codified by the State Supreme Court in Boyd v Conklin, 54 Mich 583 (1884). In Boyd v Conklin, the court defined the extent of the "rights," exposure to the rights of others, privileges, and responsibilities for land drainage.

The fact setting of Boyd v Conklin is couched in the situation of a lower elevated land owned by Boyd and bordered to the north by a road which was under the jurisdiction of the township road commissioner, Conklin. The court found that Boyd's opportunity to use and enjoy his land is interdependent and servient to the road even though it may be a detriment (cost) to him.

Over 50 years elapsed before a case developed arguing that the property rights structure should limit the servitude duty. Under territorial law, as well as Boyd v Conklin, higher elevated lands could receive payment of damages by the lower proprietors for not maintaining artificial modification of the drain pattern.

## STATUTORY DRAINAGE RIGHTS FOLLOWING STATEHOOD (1837)

Since the first State drainage statute was passed in 1839, not less than 45 separate acts were passed prior to the enactment of Michigan's Drain Code of 1956. Since 1956, the present Code has been amended over 300 times, indicating that the rules for drainage in the statutes have long been dynamic in shifting or expanding the rights and duties for artificial drainage development.

The first state statute was entitled: "An Act to Provide for the Drainage of Swamps, Marshes and other Lowland," Chapter 80, "Laws of Michigan" (1839). This act provided:

> "That any person owning any swamp, bog meadow, or other lowland who shall be desirous to drain such land and who shall deem it necessary, in order thereto, that a ditch or ditches shall be opened through lands belonging to other persons..."make an application to the township Justice of the Peace if the landowners refuse to cooperate." The Justice then issued a summons directing the county sheriff to assemble twelve "reputable freeholders" of the county. The twelve jurors then met, viewed the property in question, studied a map/plan provided by the applicant, considered arguments and approved or disapproved of the plan or made changes. If they found necessity, the jurors stated it in writing and also made a determination of whether benefits to opposing and owners were greater than damages. If the damages were greater, then the applicant paid the amount determined and the cost of the proceedings.

Essentially there was little difference between Chapter 80 and the previous Territorial Act in terms of procedures and rights.

A fundamental change occurred in 1846 when Chapter 80 appeared as Chapter 131 of the Revised Statutes and a step was added before applying to the Justice of the Peace. It provided that an application be first submitted to the township board who were "to inquire and determine and certify...whether the marsh, swamp or lowlands are a source of disease to the inhabitants, and whether the public health will be promoted by draining the same." If the board certified it as such, then the applicants filed their certification with the Justice of the Peace, who implemented essentially the same procedure as Chapter 80, involving 9 commissioners instead of 12.

Public health during this period in Michigan's history placed great emphasis on reducing the high incidence of malaria and other diseases. The misery that the settlers of the State encountered from these diseases, with transmission linked to water-bred mosquitoes, was well documented. These conditions gave Michigan a bad reputation, discouraging settlement and growth.

Apparently the public health conditions were particularly severe in Lenawee County. The legislature in PA 104 (1847) appointed by name three commissioners to supervise the drainage of lowlands in four townships that, in their judgment "affects injuriously the health of the inhabitants." This Act became the first county level drain law. It provided

that any other county board of supervisors of the State may appoint three commissioners for the same purpose. Thus a dual level of responsibility was created. The township laws were permissive, providing for involvement upon application and utilizing nine jurors to determine necessity, compensation of damages, and apportionment of benefits. The county law was directive, virtually mandating that drainage be undertaken when necessary for the public health.

Act No. 104 (1847) was amended three times before being replaced by PA 169 (1857) and, although maintained separately from the township Act 131 of the Revised Statutes, was combined with Act 131 to form Chapter 38 of the Compiled Laws of 1857 entitled: "Drainage of Swamps, Marshes and other Lowlands that Affect Injuriously the Public Health." This Act provided considerable latitude to three commissioners who were appointed and served at the pleasure of the board of supervisors. The commissioners were directed to personally examine the marshes and lowlands of the county, making observations and surveys as they deemed necessary to determine costs, routes, and dimensions of drains to serve those lands. They also determined the benefits and damages that each affected parcel of land was to pay, received bids for construction, and reported to the Circuit Court.

The court, after public notice, held a hearing and confirmed the report. The county board then ordered the taxes spread by the township and construction began.

Act 169 (1857) was the first drainage law to allow for the reconstruction or improvement of existing drains by "deepening, widening or cleaning out." It also provided for fines for obstructing drains and for annual reports by commissioners to the board of supervisors of their activities and expenditure of funds.

When the next major compilation of laws was undertaken in 1871, the dichotomy between township and county level drainage responsibilities continued appearing as Chapter 47, "County Drain Law," and Chapter 48, "Township Drain Law." The county drain law was rewritten in PA 42 (1869) after six amendments to the previous PA 69 (1857). It required only one commissioner to be appointed by the board of supervisors for two-year periods. The commissioner no longer initiated drainage proceedings but acted only upon an application signed by at least one-half of the owners of property transversed or any ten property owners if it were necessary for sanitary reasons. Applicants had to post a bond for costs incurred in case the drain was not constructed. However, once an application was received, the commissioner made a unilateral decision whether to proceed with surveying and obtaining rights-of-way.

Several other major changes or additions of Chapter 47 are involved: the option of a 12-man jury or three appointed commissioners for condemnation; abandonment of the proceedings by two-thirds of the property owners assessed at the time apportionments are reviewed if they pay all costs incurred; appeal of the commissioners' decision to the courts or a jury; for drainage between two counties, the commissioners acted as one with a report to both county boards and to the commissioner of the State land office; drainage of lakes; and to mandate a duty on the landowners whose land the drain

crosses to maintain the drain and to allow five landowners near the obstruction to apply to the commissioner for him to remove it and assess costs up to $10. If the costs exceeded this, then a majority of landowners was required with all owners of benefited land paying.

The Township Drain Law, Chapter 48 of the Compiled Laws was enacted as PA 98 (1871) and required, for the first time, the election of a township Drain Commissioner.

Taken together or singularly, the Township Drain Law and the County Drain Law represented a significant increase in the complexity of drainage rules by providing more due process and procedural review.

Separate statutory provisions for township and county drainage procedures continued until 1897 when the township Drain Commissioners' position was abolished and all drainage law was consolidated under PA 254 (1897). This Act was entitled "Construction and Maintenance of Drains." It provided for the appointment of a county Drain Commissioner for a two-year term in every county of the State. The Commissioner had jurisdiction over all legally established drains in the county including township drains, except those totally within a city. Drainage procedures were initiated by an application of ten or more property owners, at least three of which were liable for an assessment. Applicants were liable to pay all preliminary costs.

Upon receipt of an application, the Drain Commissioner would examine the route of the proposed drain and if, in his opinion, it was "necessary and conducive to the public health, convenience or welfare," he employed a surveyor to determine if it was practical. If it was, the Commissioner issued a "first order of determination" describing the route and course, dimensions, and rights-of-way that would be required. For the first time, provision was made to construct "blind" drains of tile or pipe.

The fact that the surface could be restored for use with tile drains could also be taken into account in the award for damage for rights-of-way. A requirement was also made that when a drain is constructed along a highway, each property shall be provided a bridge or culvert, the initial cost of which is part of the project. Maintenance was the property owners' responsibility. Recognition was made that the lands benefiting from the drain constituted a special assessment district and were certified in a final order of determination.

After rights-of-way were obtained, a contract was let for construction and notice for a day of review of apportionments of benefits was personally served on all landowners assessed. Assessments were based on benefits, appealable to the township, which was also assessed for public health benefits and road drainage.

The next major compilation of drainage laws occurred in 1915. PA 254 (1897) had been amended four times and PA 118 (1909) and PA 185 (1911) had also been amended.

The final major statute, prior to the present Drain Code, was PA 316 (1923) entitled: "General Drain Law," 1929 Sec. 4838. PA 254 (1897) and amendments served as the foundation of Act 316, which for the first time was identified as "An Act to codify...." The complexity of drainage legislation increased significantly with PA 316 and PA 254.

Perhaps one of the more significant, fundamental changes was the recognition of a "drainage district" and the requirement that it be established by separate application as a prerequisite to constructing a drain. The application to lay out and designate a drainage district required signatures of ten landowners of the township in which the drain was located, half of which must be liable for an assessment. If there were 20 or less property owners in the drainage district, the application required only one signature. Upon receipt of the application, the Commissioner served it on the Judge of Probate who appointed a board of determination. The board, at a public meeting, made a determination of whether the district was practical and conducive to the public health, convenience, and welfare. If it was, the board issued their order to the Commissioner, who employed a surveyor or engineer to lay out a drainage district of those lands benefited. With this information, the Commissioner published a notice establishing the drainage district.

In 1925, an amendment was added to Act 316 (1923) to provide for the issuance of bonds by the drainage district providing for up to 20 annual installments.

Thus, the Commissioner could obligate the landowners and municipalities in a drainage district to long-term indebtedness without statutory limit. The ability to bond in order to finance drainage projects was a significant milestone because it provided for the funding of the more costly projects in an affordable manner.

The drain law, by 1929, had grown to 18 chapters comprised of 60 pages of ever increasing detail. Another little heard of drainage law was passed in 1929, entitled: "Agricultural Land Drains" (CL 1929, Section 4980). This act was intended to provide an expedient procedure to collectively organize agricultural landowners and to use the Commissioner as an administrator to distribute costs, let contracts, and finance projects.

Also in 1929, Act 318 was passed amending most chapters of Act 316 (1923). Several other amendments were added in the time leading up to the new Code in 1956. By 1955, the General Drain Law had grown to a total of 19 chapters, not counting the Agricultural Drain Law. These statutes provided the basic rule structure for application of artificial drainage modification at the local, county, and multi-county levels. Because of the nature of the broad application of drainage rules, they became increasingly complex. This increasing complexity and demand for response to changing needs resulted in recodification of the Drain Laws in 1956.

## MDOT'S AUTHORITY OVER DRAINAGE AND STATE TRUNKLINES

MDOT's authority over State highways is derived from the State's Constitution and State statutes. Michigan's 1963 Constitution, Article 7, Section 16, granted the Legislature the authority:

> ".....to provide for the laying out, construction, improvement and maintenance of highways, bridges, culverts and airports by the state...."

One of the Legislature's early statutes:

> ....created and established a state highway Department, which shall be charged with the giving of instruction in the art of building, improving and repairing public wagon roads and bridges...." 1909 PA 283, MCL 225.1; MSA 9.201.

In Section 26 of this statute, the Legislature gave the State highway commission complete control over the State's highways:

> "The State highway commissioner is hereby invested with full charge and control over roads heretofore or hereafter built or maintained by the State;....." MCL 225.2b; MSA 9.204.

In 1951, the Legislature enacted Act 51 of the "Public Acts of 1951" (Michigan's Highway Law), which among other things:

> "....defined the purposes for which Michigan Transportation funds may be allocated."

In Section 10c of that statute, MCL 247.660c, the Legislature defined, maintenance to mean:

> "... routine maintenance and preventive maintenance, or both."

Under routine maintenance, Section 10c (n)(xi) states:

> "....and associated drainage."

Under preventive maintenance, Section 10c (o)(xii) states:

> "Restoration of drainage."

Thus, it may be concluded that MDOT has the legal responsibility to provide for the drainage of State trunklines and can and has incurred liabilities to third parties for failing to do so.

## ROADS AND THE DRAIN CODE OF 1956

The Drain Code preamble states:

> "An Act to codify the laws relating to the laying out of drainage districts, the consolidation of drainage districts, the construction and maintenance of drains, sewers, pumping equipment, bridges, culverts, fords, and the structures and mechanical devices to properly purify the flow of drains; to provide for flood control projects; to provide for water management, water management districts and subdistricts, and for flood control and drainage projects within drainage districts; to provide for the assessment and collection of taxes; to provide for the investment of funds; to provide for the deposit of funds for future maintenance of drains; to authorize public corporations to impose taxes for the payment of assessments in anticipation of which bonds are issued; to provide for the issuance of bonds by drainage districts and for the pledge of the full faith and credit of counties for payment of the bonds; to authorize counties to impose taxes when necessary to pay principal and interest on bonds for which full faith and credit is pledged; to validate certain acts and bonds; and to prescribe penalties." Am. 1970, Act 144, Imd. Eff. Aug. 1; - Am. 1973, Act 208, Imd. Eff. Jan. 11, 1974; - Am. 1982 Act 449, Eff. March 30, 1983.

The Michigan Drain Code is a legal vehicle which allows landowners to organize to solve mutual drainage problems for their collective benefit. Once a drainage district is formed, under procedures of the Drain Code, it becomes a public corporation with the Drain Commissioner serving as its administrator. Each drainage district, as a legal body, has the power to contract, sue, be sued, hold, manage, and dispose of property in order to construct facilities or otherwise provide the level of drainage desired by the landowners of the district.

The present statutory institutional structure that provides for the undertaking of artificial intensified land drainage in Michigan is Public Act 40 of 1956, the Michigan Drain Code of 1956. The Drain Code represents the current product of an evolutionary process that enacts and re-codifies laws that build directly upon many of the provisions of the previously cited 1923 General Drain Law. Prior to that statute, Public Act 254 of 1897 laid the foundation for many of the basic rules, most of which are recognizable in some form in the present Drain Code. Since 1956, over 200 amendments have been passed evidencing the continued evolution of the rules to respond to increasingly complex and changing situations of application.

The distinction between a "drainage district" and a "drain" is fundamental. The drainage district is a legal entity; the drain is a physical facility that serves the district. Power can only be conferred by the State to a legal entity either directly by the State Constitution or by statute in implementing a constitutional provision. Drainage districts are provided by State statute as outlined in the Drain Code, which provides that a drainage district when established "...shall be a body corporate with power to contract, to sue and be sued,

and to hold, manage and dispose of real and personal property, in addition to any other powers conferred upon it by law."

The other basic powers that are conferred upon a drainage district are the levy of special assessment taxes on the benefited lands of the district to pay for drainage facilities and eminent domain to condemn private property for the location, establishment, and maintenance of the facilities of a drainage district. The "body corporate" designation of a drainage district is also important to engage another provision of the Constitution, Article 9, Section 13, which provides: "Public bodies corporate shall have power to borrow money and to issue their securities evidencing debt, subject to this constitution and law."

Absent fraud, all matters pertaining to locating, constructing, cleaning, or extending, etc., drains are to be determined according to the procedures set forth in the Drain Code. This authority extends to all legally established drains of the county and provides broad powers for the implementation of drainage projects. It is important to note, however, that the Drain Commissioner cannot initiate proceedings to construct new drains or improve existing ones except by application or petition served upon the Commissions by a specified number of freeholders in the drainage district, municipality, village, township, County Board of Public Health, MDEQ, or MDOT.

Various chapters of the Michigan Drain Code are of particular interest to MDOT. These chapters are mentioned in more detail in the following section that outlines the various processes in the Drain Code.

**MICHIGAN DRAIN CODE PROCEDURES FOR ESTABLISHMENT OF A DRAINAGE DISTRICT AND IMPLEMENTATION OF A DRAIN PROJECT**

Understanding how the county drain systems were implemented and how they continue to be maintained and extended requires one to become familiar with Michigan's Drain Code, Act 40 of the Public Acts of 1956, as amended. Each of the various chapters of the Drain Code refers to a specific aspect of implementing county drainage projects.

Each step in the procedural process may involve an intracounty drain, intercounty drain, or a drain for public health. The process for each type of drain establishes respective drainage districts and petitions for "drain projects" is noted in the Drain Code. Reference to the appropriate chapter and section of the Drain Code is provided.

A flow chart of these steps is included as Attachment C.

| | | |
|---|---|---|
| Intracounty Drain - | Chapter 3 | Establishes the District |
| | Chapter 4 | Establishes the Drain |
| Intercounty Drain - | Chapter 5 | Establishes the District |
| | Chapter 6 | Establishes the Drain |
| Public Health Drain - | Chapter 20 | Intracounty |
| | Chapter 21 | Intercounty |

**STEP 1 – CONSTRUCTION OF INTRACOUNTY, INTERCOUNTY, AND PUBLIC HEALTH DRAINS**

Determine whether the drain or the proposed drain is an intracounty drain or an intercounty drain and whether it falls under the public health provisions of the Drain Code. This establishes who controls the following procedural process steps.

INTRACOUNTY

Essentially, if the drain project is within one county's boundaries, i.e., it is an intracounty drain, the Drain Commissioner controls the project. (See Chapter 3, Section 51.)

INTERCOUNTY

If the drain or proposed drain is an intercounty drain which traverses lands in more than one county, the Michigan Director of Agriculture, or a deputy designated by him, along with the Drain Commissioners of each county in which lands lie for assessment for benefits from the construction of the proposed drain, shall constitute a drainage board. Many of the procedural rules for intercounty drains refer to and incorporate the specifications of the intracounty procedures of the Drain Code. Some fundamental differences exist, however. (See Chapter 5, Sections 101 and 102.)

PUBLIC HEALTH - CHAPTERS 20 or 21

Intracounty and intercounty drains, which are necessary for the public health, may be located, established, and constructed under the provisions of Chapters 20 or 21 where the cost thereof is to be assessed wholly against public corporations. MDOT is considered a public corporation under these chapters.

## STEP 2 - FILING THE APPLICATION – LAY OUT AND DESIGNATE A DRAINAGE DISTRICT

Drain Commissioners do not initiate drain projects. For any Drain Commissioner to locate, establish, and construct a new county drain or a drain, which has not yet been established as a county drain, an application must be filed with his office to lay out and designate a drainage district.

INTRACOUNTY DRAINS

The initial step of the proceedings to construct a new intracounty drain or legally establish an existing watercourse is found in Chapter 3 of the Drain Code and requires that an application to "lay out and designate" a drainage district be submitted to the Drain Commission. Following entities can make application:

FREEHOLDERS OF LAND

Not less than ten freeholders of the township or townships in which the proposed lands are to be drained shall sign an application.

BOARD OF HEALTH

The application may also be signed solely by the Board of Health of the county if the proposed drain is necessary for the public health, or

CITY, VILLAGE OR TOWNSHIP

The application may be signed solely by any city, village, or township.

MDOT and County Road Commissioners

MDOT may make an application or a petition because of lack of adequate drainage facilities to accommodate the stormwater runoff from either an existing State trunkline or a proposed State trunkline. MDOT may file an application with a Drain Commissioner to lay out and designate a drainage district. Chapter 13, Section 327, states:

"In case it becomes necessary for the construction or maintenance of any highway to take the surplus water across adjacent lands, the state, county or township highway commissioner or county road commissioners may make under his or their name of office an application or petition to the Drain Commissioner of the county in which such drain is situated to lay out and

designate a drainage district, locate and establish a drain, clean out, widen, deepen, straighten or extend an established drain…

....in cases where the state highway commission makes such application or petition, he shall serve a copy of such application or petition on the Director of Agriculture who shall, within 30 days, hold a meeting at some place in the drainage district for the purpose of determining practicability or necessity of such drains, and no board of determination shall be necessary to pass on such questions."

However, before MDOT may commence the construction of a State trunkline, engineering plans shall be forwarded to the Drain Commissioner in whose county the highway is to be constructed. This must be done; there can be no exception. (See Chapter 13, Section 328.)

For landowners or petitions by public corporations, the Commissioner determines "practicability." If it is the commissioner's opinion that the drain is impractical, the applicants are informed, in writing, of that fact, including the reasons for that determination. There is no project.

If the drain appears practical, the Commissioner employs a surveyor or engineer to "determine the area which will be drained by the proposed drain, and the route and type of construction of the drain most serviceable for that purpose."

- If the survey reveals that the lands of more than one county are involved, the proceedings are terminated and must be re-initiated under the intercounty drain provisions. (See Chapter 5.)

- The drainage area is legally described and becomes the "drainage district" which will "benefit" by construction of the drain and those freeholders in the drainage district will be liable for an assessment of the proposed drain when constructed.

NOTE: MDOT is a property owner in the drainage district only if the Department owns real property which is being used for highway purposes and is located within the boundaries of the drainage district. Land not part of the "State highway" as defined by Administrative Rule 1(9), is considered "…land owned by the State of Michigan…" and cannot be subject to assessment, unless approved by the director and Michigan Department of Agriculture per Chapter 18, Section 428.

INTERCOUNTY

An application for a new intercounty drain under Chapter 5 requires:

### OWNERS OF PROPERTY TRAVERSED

The number of signatures required must be equal to 50 percent of the properties traversed by the proposed drain, all of which must be liable for an assessment.

### MDOT AND ROAD COMMISSIONERS

The Drain Commissioner to whom the application is submitted forwards a copy of the application to the commissioners of all affected counties and to the Director of the Michigan Department of Agriculture. The commissioners and the director, or a deputy designated by the director, constitute the drainage board for the proposed district and serve as the administrative board for all affairs and procedures. The director serves as chairperson of the drainage board.

The director calls a public meeting, giving proper notice as outlined in the Drain Code. Following the meeting, the drainage board makes the determination whether the drain is "practical." If not, the application is dismissed. If determined practical, the board employs an engineer to survey the drainage district and to determine the route and type of construction of a drain "most serviceable" for that purpose.

After the map of the drainage district is completed and the plans, specifications, and cost estimates are developed, the chairperson prepares the order designating the drainage district. The costs for the preliminary engineering are paid for by an agreed upon tentative percentage split between involved counties from their revolving funds.

### PUBLIC HEALTH - CHAPTER 20 or 21

The criteria for Chapter 20 (intracounty drains) provisions of the Drain Code are similar to those under Chapter 21 (intercounty drains), but vary in some of the mechanics and decision-making. Two or more public corporations may petition the Director of the Department of Agriculture for work on an existing intercounty drain or natural watercourse when it is necessary for the public health. The same requirements of the public corporations to hold a hearing and related aspects, if they are planning on special assessments benefiting landowners, applies as with intracounty drains. As with other intercounty drains, the director or a deputy serves as chairperson of a drainage board that, for initial proceedings, is an "augmented drainage board."

The augmented drainage board is only responsible for the decisions made through the final order of determination. Public hearings include determining the sufficiency of the petition, practicability of the drain and tentative determination of the public corporations to be assessed. The balance of the procedure is administered by the drainage board composed of the Drain Commissioners from

each affected county with the Director of the Department of Agriculture continuing to serve as chairman. Their duties start with the employment of an engineer to develop plans, specifications, and an estimate of cost. A tentative percentage of cost between counties is made by the board, and the Drain Commissioners apportion the cost for the public corporations in their respective counties. The balance of the procedure is virtually identical in substance as the intracounty rules, with some mechanical differences necessary for execution. (See Drain Code, Sections 467-519.)

## STEP 3 - ORDER DESIGNATING DRAINAGE DISTRICT - SUFFICIENCY

INTRACOUNTY

The entry of an order by the Drain Commissioner designating a drainage district shall be deemed a determination of the sufficiency of such application. The order must be filed before proceeding to the next step of the drain process, i.e., filing a petition to locate, establish, and construct a drain. (See Step 4 below and Drain Code, Chapters 3, 5, and 13.)

Upon filing an application with a Drain Commissioner for the determination of the boundaries of a new intracounty drainage district, the commissioner causes a survey to be made to determine the area that would be drained by the proposed drain. If, upon the survey, the Commissioner determines the drain to be practicable, he shall lay out and designate a description of the drainage district. (See Drain Code, Chapter 3, Sections 52 and 53.)

INTERCOUNTY

In dealing with an intercounty drain, the drainage board considers the application and determines practicability at the public hearing and, if finding it to be such, orders a survey to be made. Following the survey and engineering recommendations, the chairman of the drainage board shall prepare an order designating a drainage district. Notice of filing of the order shall be given by the State Director of Agriculture. The order must be filed and published before proceeding to the next step of the drain process. (See Drain Code, Chapter 5, Section 105.)

PUBLIC HEALTH - CHAPTER 20 or 21

Chapter 20 intracounty drains, public corporations; and Chapter 21 intercounty drains, public corporations do not require an order designating a drainage district.

## STEP 4 - FILING THE PETITION TO LOCATE, ESTABLISH, AND CONSTRUCT

The Office of the Drain Commissioner must be presented with a petition before establishing, constructing, cleaning out, widening, deepening, straightening, or extending a county drain, intercounty drain, or a drain for the public health.

After a drainage district has been established and the Drain Commissioner's order designating the drainage district has been filed in his office, a petition to locate, establish, and construct a drain may be filed with the Commissioner. Determine what chapter of the Drain Code is being used in the petition to locate, establish and construct a county drain. Such a petition shall ask for the location, establishment, and construction of the drain. (See Drain Code, Chapters 4 (Intracounty) and 6 (Intercounty).)

INTRACOUNTY

Section 71 requires the petition must make reference to the drain and be signed by:

>   Freeholders - a specific number of freeholders within the drainage district;

>   A city, village, township; or

>   MDOT, or County Road Commissioners (see Drain Code, Chapter 3, Section 327).

As soon as practicable after the filing of a petition, the Drain Commissioner may appoint three disinterested property owners of the county, that do not reside in the township, city, or village affected by the drain, to serve as a "board of determination." (See Step 5.)

INTERCOUNTY - SECTION 121

To construct an intercounty drain, a petition under Chapter 6 of the Drain Code is required, signed in the same manner as was required for the application. Unlike an application for the drainage district, a public corporation, which is liable for an assessment at-large, may petition in lieu of land owners.

PUBLIC HEALTH CHAPTERS 20 AND 21

Intracounty drains, which are necessary strictly for the public health, can be established and constructed under the provisions of Chapter 20 of the Drain Code when the entire cost is assessed against pubic corporations. Public corporations include counties, cities, villages, townships, and MDOT, two or more of which are required to petition unless a drain is totally within one jurisdiction. Note: Public Corporations may levy a special assessment directly to benefited properties or pay the assessment at-large across the corporation.

When a valid petition is submitted under the provisions of Chapter 20, a three-person drainage board is formed. The drainage board, at its first meeting, tentatively determines the sufficiency of the petition, the practicability (not necessity) of the drain, and they make a tentative determination of the public corporations to be assessed. The assessed public corporations compose the drainage district. The

drainage board also names the drain and sets a time, date, and place for a hearing on the proposed drain. (See Step 5.)

## STEP 5 - BOARD OF DETERMINATION, PRACTICABILITY, AND NECESSITY

INTRACOUNTY

After the filing of a petition asking for the location, establishment, and construction of an intracounty drain, the Drain Commissioner shall appoint a board of determination composed of three disinterested property owners. The Drain Commissioner must convene a board of determination for the purpose of determining "necessity."

A notice of the first meeting of the board of determination is sent to the MDOT Drainage Coordinator. This is generally the first communication to the Department that the Drain Commissioner has received an application to establish a drainage district or has received a petition for a drain project.

A meeting of the board of determination shall be called within the drainage district at a convenient place to be designated by the Drain Commissioner. At a public meeting, the three-member board determines the "necessity" of the proposed drain and whether it is "conducive" to public health, convenience, or welfare.

If the board finds the drain to be necessary, a notice of the order by the board regarding benefits at-large is sent to municipalities and other property owners in the drainage district. After the order of the board is filed with the commissioner, a "first order of determination" is prepared and filed in the Commissioner's office giving the name of the drainage district, route, and type of construction of the drain. (See Drain Code, Chapter 4, Section 72(3)).

MDOT's RESPONSE TO NOTICE AND ORDER

Either the notice of meeting or receipt of the order requires the MDOT Drainage Coordinator to do the following:

1. Fax the notice of meeting of the board of determination to the Region/TSC Drainage Coordinator.

2. Prepare a form letter (see attachment; a copy of form letter) to the Drain Commissioner acknowledging the Notice of Board of Determination Meeting, with copy to the Regional/TSC Drainage Coordinator. The form letter outlines MDOT's need for:

   - Drainage district map.
   - Engineering calculations per Section 14A.
   - Plans and specifications.
   - MDOT construction permit. MDOT provides contact name at Region/TSC.

3. Send a copy of the form letter to Region/TSC Drainage Coordinator and Utility-Permits agent.

4. MDOT Drainage Engineer establishes a drain file to be located in the Design Support Area, Hydraulics/Hydrology Unit. This unit maintains all county drain files.

An engineer is engaged to prepare detailed construction plans and specifications and a description of the rights-of-way required for construction and maintenance. The Commissioner then undertakes the task of obtaining the release of those right-of-way parcels necessary for construction. After all right-of-way parcels have been acquired, the Drain Commissioner makes a "final order of determination" establishing the drain and prepares for the letting of construction contracts. (See Step 6.)

INTERCOUNTY DRAIN

The Michigan Department of Agriculture must convene a public meeting of a drainage board to determine "practicability." Under Section 122, a public hearing is called for, determining the "necessity" of the drain for the good of the public health, convenience, or welfare. The drainage board determines the percentage of costs between counties.

The established apportionment percentages between and amongst the counties, necessity determination, and number of installments for payment are evidenced by the board's "first order of determination." Each Drain Commissioner determines benefits and holds a separate day of review of apportionments. A final opportunity to appeal the procedure is afforded after review of certiorari (a common law issued by a superior court demanding the record of a particular case). If there is no appeal, final design and letting of construction begins. (See Step 6.)

PUBLIC HEALTH - CHAPTERS 20 AND 21 - SECTIONS 467 AND 519

Notice of the first hearing by the drainage board is published in the newspaper and sent by registered mail to each public corporation involved, including the County Road Commission and Director of MDOT. After the hearing, the drainage board makes a "first order of determination" regarding the sufficiency of the petition, practicability of the drain, whether it should be constructed, and the public corporations to be assessed. (See Drain Code, Section 467.)

After the first order of determination, the drainage board employs an engineer to design, prepare plans, and provide specifications for the proposed drain. An estimate of the cost is submitted, and after all information is acquired, the board makes a tentative determination of the percentage of cost that each public corporation, under public health benefits, and the State and county under highway benefits, will be liable for. A public hearing is then arranged to hear objections to the

tentative apportionments with similar notice provisions as the first hearing. When the apportionments are confirmed, a "final order of apportionments" is issued.

After the apportionments are finalized, rights-of-way are obtained with condemnation power available. Contracts for construction are let and assessments to the public corporations levied. Chapters 20 and 21 of the Drain Code detail the procedural process required for bonding of a drain project, the handling of funds and investments, and the levy of special assessments by individual public corporations.

## STEP 6 - APPROVAL OF DRAIN PLANS AND SPECIFICATIONS - DESIGN PHASE

Regardless if the drain project is an intracounty drain, intercounty drain, or drain for the public health, preparation of plans and specifications are undertaken per direction of the Drain Commission or Drainage Board.

Intracounty Drain      - Chapter 4, Section 73
Intercounty Drain      - Chapter 5, Section 104
Public Health            - Chapter 20, Section 468, and Chapter 21, Section 520

During the very preliminary stages of the drain design process, it is essential that the Drain Commissioner, drain office staff members, and consulting engineers retained to prepare design plans coordinate those aspects of the drain project that affect the State trunkline with MDOT's Drainage Coordinator and Drainage Engineer. It is most important that resolution of any concerns regarding the design take place early on in the county project design process.

This process will involve submittal of early preliminary plans, discussion of construction requirements which involve the trunkline, discussion of MDOT's pro rata share of stormwater runoff, the permit process, present and possibly future Department drainage needs, supplemental benefits which the Department may desire and, where appropriate, any formal special agreements between the Department and Drain Commissioner. Please see the section of this guideline titled: "Section 14a of Act 51, the Administrative Rules and Discussion."

MDOT CONSTRUCTION PERMIT

When any new drain crosses a State trunkline, the necessary bridges or culverts shall be constructed in accordance with plans and specifications, which shall be approved by the Director of MDOT. MDOT's construction permit processes are covered in its Construction Permit Manual. Under the Drain Code, Chapter 13, Sections 321, 322, and 323, repeatedly state this requirement for Department approval:

Section 321 - "Drains may be laid within or across the right-of-way of any highway, provided the county Drain Commissioner first obtains a permit from the highway authority having jurisdiction. If title in fee simple be not in the highway authority, said

commissioner shall also obtain a release of right-of-way for the purposes of such drain from the owner of the land…"

Section 322 - "When any drain crosses a highway, the necessary bridge or culvert shall be constructed…in accordance with the plans and specifications which shall be approved by…state highway commissioner if such highway is a state trunk line. The cost of constructing the necessary bridge or culvert shall be charged in the first instance as part of the construction of such drain. The board of county road commissioners or the state highway commissioner shall assume and bear such portion of the cost of construction, based upon benefits, as may be agreed upon with the Drain Commissioner. In such case, the contract for the construction of the bridge shall not be let by the Drain Commissioner without the written consent of the state highway commissioner or the board of county road commissioners. Thereafter, such bridge or culvert constructed under the provisions of this act shall be maintained by the county road commission or State Highway Commissioner. Any such expense charged to the State Highway Commissioner shall be met out of any funds appropriated for MDOT that may be available therefor; and any such expense to be borne by the board of county road commissioners shall be paid out of monies in the county road fund not otherwise appropriated."

SECTION 323 – "Before a drain is constructed along a public highway, the Drain Commissioner or drainage board shall consult with and obtain the written consent of the highway authorities having jurisdiction over the highway, as to the proposed location of the drain and disposition of all material excavated."

## STEP 7 - FINAL ORDER OF DETERMINATION OR APPORTIONMENT

Upon the release of all rights-of-way and damages, the Drain Commissioner shall make his final order of determination establishing the drain. (See Drain Code, Chapter 7, Section 151.) For Public health drains under Chapters 12 and 21, this is known as the "final order of apportionment" (Drain Code, Sections 469 and 521).

The order is on file with the Drain Commissioner; no copy is provided to MDOT.

## STEP 8 - NOTICE OF APPORTIONMENT AND DAY OF REVIEW

Payment of drain projects is covered under Chapter 7 of the Drain Code. Specific sections are noted here and how they impact MDOT. Section 151 states:

"The drain commissioner shall apportion the percent of the cost of construction of such drain which any state trunkline highway, under the control of the state highway commissioner, shall be liable to pay by reason of benefits therefore and as the means of improving said trunkline."

All apportionment of benefits as determined by the Drain Commissioner "…shall be upon the principle of benefits derived." (See Drain Code, Chapter 7, Section 152.)

This is the most controversial aspect of the Drain Code. This single sentence is a potential conflict MDOT's ability to pay drainage assessments as it is limited under Section 14a of Act 51 of the Public Acts of 1951 and its Administrative Rules. Act 51 is the law used to collect gas, license, and weight tax monies. These monies are ultimately distributed to MDOT, county road commissions, and municipalities to be used for transportation purposes. This is the only source of funds available to the Department for use in paying drain assessments.

This is a critical juncture in the apportionment process. Apportionments are against the total cost of a drain project and are expressed as a percentage. The only guide the Drain Code provides in setting the apportionment of benefits is based on the "principle of benefits derived." This allows apportionments to be determined at the discretion or judgment of the Drain Commissioner. Nevertheless, it is implied that equally situated property in the drainage district will be apportioned uniformly. Further discussion is provided in a later section titled "Act 51 vs. The Drain Code on the 'Benefit' Standard."

Consulting engineering firms and others who calculate drain apportionments for the drain commissioners should be fully informed that this Department requires adequate documentation to support a drain apportionment. Further, this documentation must be based on an analysis that conforms to the Administrative Rule requirements promulgated under Section 14a of Act 51.

MDOT's Drainage Coordinator must review the drain project plans to verify that the Department's apportionment is based upon a Section 14a drain analysis.

The Department's Drainage Coordinator will advise the Drain Commissioner, in writing, as to whether the Department objects (go to Step 9) or concurs (go to Step 10) to the drain apportionment.

<u>NOTICE OF BIDS AND DAY OF REVIEW</u>

Chapter 7, Section 154 (1) states:

> "The drain commissioner shall give notice for the receiving of bids for the construction of the drain and for the holding of a public meeting. At the meeting, a review shall be made of the apportionment of benefits as determined by the drain commissioner. The notice shall specify the time and place of receiving bids, and the time and place of the meeting for the review of apportionments."

MDOT is unique under the Drain Code in that it is the only agency or public corporation that has separate and specific notice, right to consent, and right to object to its apportionment criteria. Section 154(4) provides:

> "When an apportionment of benefits is made against a state trunkline highway, unless the State highway commissioner consents in writing to the

apportionment, the drain commissioner, at least 20 days before the review on the trunkline, shall notify by registered mail the director of MDOT of the percentage apportioned against the highway and the date, time, and place fixed for a review of apportionment of benefits."

At this point in the process, MDOT's Drainage Coordinator has already put the Drain Commissioner on notice, via the form letter in Step 4, that the pending drain project apportionment to the department must use Section 14a criteria.

Newly constructed drains and maintenance of these drains require the Drain Commissioner to apportion the cost of the construction among the freeholders (landowners) in the drainage district. The MDOT Drainage Engineer will verify the Department's apportionments. There are two methods of verifying apportionments:

- For existing drainage districts, maintenance assessments will be based on the historical apportionment percentage, unless MDOT's Drainage Engineer determines there is a significant change in land use affecting MDOT's pro rata share of runoff.

- For construction projects, the Drainage Engineer will follow the Section 14a criteria of "flow share" as outlined in Section 4.01.06 B, "Participation Agreements and Costs," MDOT's Road Design Manual, or Section 2.5.4.2 of MDOT's Drainage Manual.

MDOT may object to an apportionment (go to Step 9) based on one of the following situations:

- The apportionment calculated by the Department is significantly different from that determined by the Drain Commissioner. Note: MDOT has 10 days from receipt of notice of the public meeting referred to as the Day of Review to object to the Drain Commissioner.

- If Notice is not received within the required 20 days before the Day of Review and this is not an agreement.

- For Chapters 20 and 21 drains, objections must go through the Chairman of the Drainage Board (Sections 469 and 521) and are subject only to "certiorari" or procedural objections. (See Drain Code, Sections 483 and 536.)

By the day of letting of contracts, the percent of benefits to be apportioned must be set against the municipalities on the basis of public health, against the county at-large for benefits to county roads, and against MDOT for benefits to State highways. The balance is charged to the property owners in the drainage district based upon the principle of benefits derived.

If MDOT agrees with the apportionment percentage go to Step 11.

## STEP 9 - MDOT OBJECTION TO APPORTIONMENT

If the Department objects to the drainage assessment percentage, every effort will be made to resolve any differences regarding the various factors affecting this matter within the statutorily prescribed time limitation.

If the Drainage Coordinator determines that objection to the apportionment of benefits is needed, he will draft a letter of objection for the Director's signature to the Drain Commissioner, with copy to the Director of the Michigan Department of Agriculture, within ten days from the receipt of the notice. See Chapter 7 of the Drain Code, Section 154 (4). If major differences cannot be reconciled, the Department, within the statutorily prescribed time restraints, will initiate transmittal of this letter of objection, and seek assistance of the Office of the Attorney General, Transportation Division, for the drainage assessment appeal process.

Notice the ten-day statutory limitation is an absolute restriction on time allowable to MDOT to file an objection to an apportionment of benefits as determined by the Drain Commissioner. Again, if the Department's Drainage Coordinator has not received the drain plans or the documentation supporting the apportionment, an immediate objection must be filed with the Drain Commissioner. (See Drain Code, Chapter 7, Section 154 (4).)

## STEP 10 - REVIEW OF MDOT OBJECTION BY MDA

The Michigan Department of Agriculture (MDA) oversees MDOT's objection as stated in Section 154(4):

> "The Drain Commissioner shall notify the Director of the Department of Agriculture of the date, time, and place fixed for the review of MDOT's apportionment, and at the meeting, the deputy or the director shall review the apportionment made against the state trunkline, listen to the proofs and allegations of the parties, and may view the highway benefited. The action and the decision on the apportionment reduced to writing shall be final."

The review of MDOT's apportionment by the Michigan Department of Agriculture (MDA) should not to be taken lightly. MDOT is the only State department and the only agency, body, or freeholder whose objection to an apportionment decision is adjudicated in the first instance by the MDA. All others such as freeholders (owners of land in the drainage district), or any city, township, village, district, or county road commission who feels aggrieved by the apportionment of benefits so made by the Drain Commissioner must appeal to the Probate Court of the appropriate county.

The Department's Drainage Coordinator and Drainage Engineer must be fully prepared to present the Department's case.

- The Drainage Coordinator must consult the Attorney General's Transportation Division to discuss all aspects of the proposed presentation.

- The Region Engineer and the Region or TSC Drainage Coordinator must be consulted and requested to provide any information that might be available to them.

- The Drainage Engineer must prepare the necessary visual aids, such as plan-profile sheets, drainage district maps, and apportionment computations, to support the Department's position.

The final sentence of Section 154 (4) of the Drain Code states:

> "The action and decision (by the Deputy of the Department of Agriculture) on the apportionment reduced to writing shall be final."

This is not necessarily final. MDOT has taken decisions rendered by the Department of Agriculture into District Courts and the Michigan Court of Appeals. See Imlay City Branch of the Belle River Drain, Lapeer County. Such cases have resulted in settlements.

## STEP 11 - NO OBJECTION - MDOT INITIAL ASSESSMENT REVIEW

<u>Final Project Review and MDOT Construction Permit</u>

If the Drainage Coordinator and the Regional Drainage Coordinator have been involved with the project and are, therefore, familiar with the details, the final review will be routine and should not involve major issues that require significant time to resolve. There should not be a problem with receiving county design plans for the project since construction bids for the project are required for the "Day of Review" per Section 154(1), and MDOT must be notified of the apportionment 20 days before the Day of Review.

Governmental units or their agents who perform work within the State trunkline rights-of-way are required to obtain a construction permit from MDOT. Formal application for a Department permit must be submitted to the Department's Region/TSC office as early in the design process as possible. Permits may require arrangements for insurance and performance bonds that may be required in the drain project contract proposal. MDOT's Region/TSC Utilities-Permits Engineer issues this construction permit. Notification to the Department prior to performance of the work and compliance with permit conditions is essential for proper construction bids to be received at the Day of Review.

The engineer for the drain project should be applying to MDEQ for land and water interface permits.

## Agreements

Agreements may be prepared between the Department and the office of the County Drain Commissioner for the following:

- When the Drain Commissioner wishes to have work included in a Department construction project that would benefit a county drain per Administrative Rule 4. The agreement will contain the responsibilities of both parties which will include, but not be limited to, financing, contracting, engineering, and operation and maintenance responsibilities. The agreement will include the present apportionment percentage as related to these costs, particularly to future operation and maintenance costs.

- When the Drain Commissioner wishes to have work incorporated in a MDOT construction project, the Drain Commissioner will be asked to accept responsibility for that portion of the design of the drain, to share in the preliminary and construction engineering costs in the same ratio as their work is to the Department project, and to make a deposit to the Department for work in accordance with the Department's deposit schedule. Maintenance responsibilities will be addressed in the agreement.

- When the Department wishes to have the Drain Commissioner perform additional construction work on a county drain project beyond that which would normally be included as a part of the drain improvement, e.g., in the case either an agreement or supplement benefits per Administrative Rules 3 and 4 will apply. For those projects where it is desirable to have the Drain Commissioner perform drain work for the Department's benefit, the agreement may require:

  - Department concurrence in the bid process before awarding the contract.

  - Insurance consistent with that provided on Department construction projects naming the Department as an insured party.

  - Lien and performance bonds where applicable.

The Department will pay on a progress billing arrangement in accord with the terms of the agreement. If there is any arrangement for work performance or cost participation which requires a formal agreement between this Department and the Drain Commissioner, it must be undertaken in a reasonably expeditious manner to avoid delays in implementing the drain project. Any work by the Drain Commissioner involving payment by the Department pursuant to an agreement requires that the agreement be fully executed prior to the performance of such work. Contact both the Drainage Coordinator and MDOT's Governmental Coordination Engineer.

**MAINTENANCE OF COUNTY DRAINS**

Maintenance projects, unlike drain construction projects, do not require the submission of an application to locate and establish a county drain. The county drain has been established and located. Now, it remains for the Drain Commissioner to keep the established county drain in satisfactory repair. This requires the Drain Commissioner to maintain the county drain so that it functions properly.

MDOT's definition of maintenance may differ greatly from a Drain Commissioner's definition of maintenance. Basically, Drain Commissioners relate maintenance projects to the reestablishment of the original drain grade line, and, likewise, the ability of the county drain to maintain its original capacity to accommodate stormwater runoff.

The procedural process for initiating Chapter 8 improvements are identical in many respects to a Chapter 4 (Locating, Establishing, and Constructing a New Drain) procedure with regard to: appointment and function of a board of determination; right-of-way condemnation; apportionment of benefits and review; and the letting of contracts. Unlike a petition for a new drain, no engineering information is available prior to petitioning, and no requirement exists that there be preliminary engineering data available prior to the determination of necessity by the board. Therefore, decisions by the board under a Chapter 8 petition are made without the advantage of physical feasibility or costs being known.

If a petitioned project is declared necessary, an engineer is employed, and survey and design work is undertaken. The petition must specify the nature of the improvements desired, which may include any one or a combination of the following: cleaning out, relocating, widening, deepening, straightening, tiling, extending, relocating along a highway, adding structures and mechanical devices to purify the flow, pumping equipment, relief drains, or adding branches. (See Drain Code, Section 191.)

For the intracounty drains, if the petitioned project is declared not necessary, the expense shall be paid from the general fund of the county and no new petition may be submitted for at least one year.

Maintenance under the Drain Code is loosely defined as "maintaining the drain in working order to continue a normal flow of water." Amendments to the Drain Code in 1989 increased the amount a Drain Commissioner or a drainage board for an intercounty drain may expend without petition. This amount may not exceed, in any one year, $2,500 per mile or fraction of a mile for maintenance and repair of a drain. In addition, the amendments permit for the first time, pre-assessments in the amount of $1,250 per year. This assessment is in anticipation of maintenance to a maximum fund balance equal to $2,500 per mile of drain length. The expense for repair and maintenance are paid from funds within that drain account, or if the drain account is not sufficient funds are taken from the revolving fund.

**MAINTENANCE - PETITION**

INTRACOUNTY

When a county drain or portion thereof, which traverses land wholly in one county (intracounty), is subject to assessment, requires cleaning out, relocating, widening, deepening, straightening, tiling, extending, or relocating along a highway or adding of branches;

> "…any five (5) or at least 50% of the freeholders...whose land shall be liable to an assessment for benefit of such work, may make petition in writing to the drain commissioner setting forth the necessity of the proposed work and the commissioner shall proceed in the same manner provided for the location, establishment, and construction of a county drain." See Chapter 8, Section 191.

INTERCOUNTY

Whenever a drain traverses lands in more than one county, and those lands shall be subject to assessments when that county drain needs cleaning out, relocating, widening, deepening, straightening, tiling, extending, relocating along a highway, or branches added, then 50 percent of the freeholders in the drainage district may petition the Drain Commissioner to perform maintenance work on the intercounty drain. (See Drain Code, Chapter 8, Section 192.)

A Drain Commissioner receiving the maintenance petition for an intercounty drain is required to notify the State Director of Agriculture and the Drain Commissioners of each county with lands in the drainage district. The procedural process for implementing an intercounty maintenance project follows closely the procedure used in intracounty drain construction projects. The Director of Agriculture calls a meeting within the drainage district at the time and manner as prescribed in Chapter 5, Section 122. The drainage board shall consist of the respective Drain Commissioners and the Deputy from the Department of Agriculture.

The Drainage Board, chaired by the Director of the Department of Agriculture shall, following the convening of the drainage board, take all the steps and perform all acts which are required to be done by the drainage board upon a petition for the location, establishment, and construction of drains as provided in Sections 121 to 135 of the Drain Code.

PUBLIC HEALTH (City, Village, Townships)

"When it is necessary for the public health of one or more cities, villages, and townships, the petition may be signed solely by a city, village, or township when authorized by its governing body or by a combination of the municipalities, if the municipality or municipalities are liable to assessments at large for a percentage of the

total amount assessed for the cost of the proposed work." (See Drain Code, Chapter 8, Sections 191 and 192.)

<u>MDOT and County Road Commissioners</u>

It is important to remember that MDOT and County Road Commissioners may make such petition to the Drain Commissioner of the county in which the State trunkline is situated to lay out and designate a drainage district, locate and establish a county drain, clean out, widen, deepen, straighten, or extend an established drain. (See Drain Code, Chapter 13, Section 327.)

In cases where MDOT makes such application or petition, the Department shall serve a copy of such application or petition on the Director of Agriculture who shall, within 30 days, hold a meeting at someplace in the drainage district for the purpose of determining the practicability or necessity of such drain, and no board of determination shall be necessary to pass on those questions. See Chapter 13, Section 327, (Step 2 of construction process).

The deputy designated by the Director of Agriculture to conduct this meeting will unilaterally make the decision regarding "practicability" and/or "necessity." The determination of the deputy shall be filed with the Drain Commissioner.

## PROCEDURE AND APPORTIONMENT

County drain maintenance work procedures closely follow those for construction of new county drains. For instance, after the board of determination determines the necessity for the work (as provided in Section 72 of the Drain Code) the Drain Commissioner shall, as soon as practicable, after he has filed the final order of determination (prescribed in Section 151 of the Drain Code) proceed with the apportionment and review for the maintenance work as provided in Sections 151 to 161 of the Drain Code.

Maintenance work is only performed on existing, established intracounty or intercounty drains. At the time the drain was newly constructed and established as a county drain, the county Drain Commissioner or drainage board determined the apportionments for all freeholders (which includes MDOT and the County Road Commissions) within the drainage district. Therefore, unless the nature or characteristics of the drainage district have been appreciably altered, the apportionments will remain the same as the last recorded apportionments unless they are challenged by one of the freeholders within the drainage district.

The challenger must, generally, pay the Drain Commissioner's expenses in connection with reapportioning the drainage district. However, if the nature of the drainage district has changed significantly, the Drain Commissioner will generally embark on a re-apportionment of his own accord.

## MDOT

If, for any reason, the Drain Commissioner changes MDOT's apportionment, MDOT's Drainage Coordinator and Drainage Engineer must closely examine the change. The reason for the change must be put in writing and included as part of the documentation in the respective drain file. Most importantly, the apportionment change must be rational and reasonable for the Department to accept this alteration. The Drainage Engineer must work closely with the Drain Commissioner in an effort to resolve any conflict in this area. However, all apportionments that are changed are subject to appeal (note construction Step 8 above). If the apportionments shall be the same as the last recorded apportionment, no Day of Review shall be necessary.

In those cases where the apportionments have been changed, or in those cases where an apportionment is made in a consolidated district which apportions benefits between lands which have not been previously assessed by the consolidated district, the Drain Commissioner must use the entire apportionment procedure as outlined in the construction of a new county drain (See Drain Code, Chapter 7). This would include notice and holding a day of review.

The Drain Commissioner shall, within ten days after the letting of the contract, determine the entire cost of the drain work and shall thereupon make a special assessment roll for the drain for each county, township, city, or village and each state trunkline highway affected thereby, which roll shall be designated, giving it a name or number as "drain special assessment roll."

It is not unusual for Drain Commissioners to submit the drain special assessment rolls before the last Wednesday in September in each year, in the office of the county clerk. Thereafter, MDOT would receive a billing or invoice for its portion of the maintenance costs performed in that county for that particular year. (See Drain Code, Chapter 11, Section 262.)

If no contract shall be let within five (5) years after the date of filing the petition to locate, establish and construct or deepen, widen, straighten, tile, extend, or clean out a drain, the Drain Commissioner or Drainage Board for Intracounty Drains, may determine that the petition be deemed abandoned and no further action will be taken to construct or maintain the drain. (See Drain Code, Chapter 9, Section 221.)

## DRAINS NECESSARY FOR PUBLIC HEALTH - CHAPTERS 20 AND 21

Chapters 20 and 21 of the Drain Code, provides for the determination of apportionments to those public corporations owning lands within the drainage district, i.e., State, counties, cities, villages, townships, metropolitan districts, and authorities created by or pursuant to state statues. (See Drain Code, Sections 462 and 512.)

PETITION - CAN BE FILED

If a drain project (construction) is being petitioned under Chapter 20, it will be necessary to have a minimum of two public corporations sign the petition. The best approach is to have all of the public corporations liable for an assessment sign the petition. Those public corporations are:

> Villages, Cities and Townships
>
> County Board of Commissioners
>
> MDOT
>
> MDEQ - By order of determination pursuant to Part 31 of NREPA calling for the "…construction of disposal facilities or other appropriate measures by which the unlawful discharge may be abated or purified." (See Drain Code, Section 423(3).)

It is not necessary under a Chapter 20 drain project to file an application with the Drain Commissioner to lay out and designate a drainage district.

All drain projects (construction or maintenance) must be petitioned under a specific chapter of the Drain Code. For each project petitioned under the provisions of Chapters 20 and 21, a drainage board is created. The board makes a determination of the practicability of the proposed drain and the public corporations to be assessed. The drainage board retains the services of an engineer to prepare plans and an estimate for the cost of the drain project.

The drainage board establishes apportionments for each of the public corporations to be assessed. In making apportionments, the drainage board shall take into consideration the benefits to accrue to each public corporation and also the extent to which each public corporation contributes to the condition which makes the drain necessary.

Apportionments against MDOT shall be based upon the benefits and contribution as related solely to the drainage of the State trunkline.

The Drain Commissioner and the drain plans provided to the Department's Drainage Coordinator and Drainage Engineer must document the apportionment against MDOT. The Drainage Engineer must verify the apportionment percentage.

The drainage board shall set a time, date, and place to hear objections to the apportionments. Notice of the hearing will be sent to either MDOT's Director or Drainage Coordinator.

If the Drainage Coordinator is concerned about MDOT's apportionment or has sufficient reason to question apportionments to the public corporations, an objection must be immediately filed with the drainage board. This differs from the objection procedure outlined in Step 10.

The special assessment roll is prepared, containing the name of each public corporation, their apportionment, and assessment.

**PAYMENT OF DRAIN ASSESSMENTS**

The funding source for drainage assessments for construction of county drains is the Michigan Drain Assessment (MDA) Funds. The Department allocates funds, via a project job number, for paying construction and maintenance assessments for county drains. MDA funds are a line item in the Department's budget.

MDA funds are used to finance the ongoing Southeastern Oakland County Sewage Disposal Stormwater Treatment Charges and City of Detroit Stormwater Treatment costs, as well as the multitude of combined sewer overflow (CSO) and combined sewer separation projects through the entire State of Michigan.

RULE: The Department's Regional Drainage Coordinators must be constantly alert for additional Departmental monies to fund drainage construction projects for the various CSO and stormwater treatment charges, and advise the Drainage Coordinator accordingly.

The method and manner used by Drain Commissioners to finance drain projects should be of special interest to both the Regional Drainage Coordinator and the Department's Drainage Coordinator. Many of the Drain Commissioners will bond the more expensive drain projects over a 5-, 10-, or even 20-year period. The Drain Commissioners will also attempt to use grant monies when possible (CSO projects) and fund projects of an environmental nature such as CSO and stormwater treatment facilities with low interest loans from the State of Michigan. The Department's Drainage Coordinator must determine appropriate funding opportunities presented to the Department, i.e., whether to participate in bond payments or pay construction cost up front if funds are available.

The Drain Commissioner will provide the Department's Drainage Coordinator with either an assessment roll or a drain assessment invoice. These documents will indicate the total project cost, the apportionment percentage, and the amount owed by the Department for the construction or maintenance work performed, or to be performed on the county drain project.

MDOT must account for expenditures of public monies. Those monies expended by the Department for payment of drain assessments are no exception.

In order to facilitate this accountability/documentation requirement, the Department has initiated a process whereby a request for a final accounting of the expenditure of those drain funds used for drain construction purposes will be transmitted, by letter, to the county Drain Commissioner for those drain projects where the Department has been assessed.

The final accounting statement must reflect, among other things, whether the Department's assessment exceeded its share of the total costs and, if so, how those excess funds were disbursed. MDOT can recover "…on a pro rata basis, surplus construction funds…" (See Drain Code, Section 283(3).)

For the Department to pay drainage assessments under Chapters 20 and 21 drains, the Drain Commissioner assessing MDOT for benefits received from work performed on a county drain must add a certification letter stating that he approves of the assessment and that it is a valid and proper charge against the Department. This letter must be signed and dated by the Drain Commissioner. (See Drain Code, Sections 474 and 526.)

Upon receipt of either the assessment roll or invoice, the Department Drainage Coordinator will direct the Drainage Engineer to confirm the apportionment percent and to initiate the payment through Project Main. In order to accomplish this, the following must be in the possession of the Drainage Coordinator:

- The invoice from the Drain Commissioner, as well as other supporting documents, must be available to be attached to the payment voucher when it is submitted to Bureau of Finance-Financial Operations Division.

- The Drain Commissioner's certification statement for Chapters 20 or 21 drains indicating that the drainage assessment charges are proper and valid has been received.

- Using Project Main, the Drainage Engineer creates a payment voucher. The Department's Drainage Coordinator electronically signs the payment voucher certifying that the drainage assessment charges are proper charges against MDOT. The invoice, as well as all documentation supporting the drain costs and the Chairman of the Drainage Board certification (for Chapters 20 and 21 Drains) that the drain assessment charges are proper and valid, are signed by the Drainage Coordinator and must be attached to the payment voucher.

- The payment voucher is then forwarded to the Bureau of Finances, Financial Operations Division.

- The original copies of all documentation attached to the payment voucher must be kept in the drain file in the Design Support Area prior to submission of the payment voucher to the Bureau of Finance.

## SECTION 14A OF ACT 51 AND ITS ADMINISTRATIVE RULES

<u>In General</u>

Pursuant to Section 14a of Act 51 of the Public Acts of 1951, as amended, being MCL 247.664a; the Michigan Department of Transportation and the Michigan Department of Agriculture Promulgated Rules 280.1 et. seq. (see attached Administrative Rules) which established a specific method for determining the apportionment of benefits determined or made for the drainage of county roads or State trunklines. The Administrative Rules provided for an engineering determination of benefits based on the pro rata share of stormwater runoff from the county roads or State highways within the drainage district in direct proportion to the total stormwater runoff in the entire drainage district.

Section 14A states:

> "Expenditure of funds allocated by this act to the department of state highways or to a county road commission to pay the cost of drain assessments under Act No. 40 of the Public Acts of 1956, as amended, being sections 280.1 to 280.623 of the compiled laws of 1948, imposed after the effective date of rules, promulgated under this section, shall be made only if all apportionments of benefits of any nature or kind determined or made for the drainage of county roads or state highways are made in accordance with rules jointly promulgated by the department of state highways and the department of agriculture. The department of state highways and the department of agriculture jointly shall promulgate rules in accordance with and subject to Act No. 306 of the Public Acts of 1969, as amended, being sections 24.201 to 24.316 of the Compiled Laws of 1948, to provide for an engineering determination of benefits based on the pro rata share of stormwater runoff from the county roads or state highways within the drainage district in direct proportion to the total stormwater runoff in the entire drainage district. Fifty percent of the cost of a drain assessment against the county for the drainage of county roads shall be paid by the county road commission from county road funds. Expenditures for such purposes shall be reported separately by each county road commission to the state highway commission. Section 16 applies to expenditures made pursuant to this section."

The Administrative Rules were filed with the Secretary of State on August 15, 1977, and took effect 15 days following this filing date and are provided in Attachment D. The rules not only provided the manner by which the Department's share of drain apportionments are calculated, but also provided the vehicle for payment of those drain assessments.

The following is a discussion of each of the rules as they apply to MDOT apportionment percentage.

Rule 280.1 - Definitions

Rule 1 - Rule 1 provides the basic definitions for terms used throughout the text. Of particular importance to the Department is Rule 1 (9), the definition of a State highway "..state highway means a roadway, including the right-of-way, under the jurisdiction of the Department..."

It may include property contiguous to the highway which is owned in fee or in easement by the Department and is used for highway purposes. It does not include facilities such as garage sites and office buildings that are not contiguous to the highway right-of-way..."

A Drain Commissioner lacks the statutory authority to assess MDOT for those excess parcels of property owned by MDOT but not being used for highway purposes. See Section 426. This position is supported by Attorney General Opinion OAG 1959-1960, No. 3437, page 201, wherein the attorney general ruled that "...a special drain assessment may not be imposed against state-owned excess lands not embraced within operating highway right-of-way, absent express legislation making such lands subject to special assessment." Opinion No. 3437, supra, also recognized that, "state highway trunkline lands are subject to drain assessments based solely upon drainage of those state highways."

Based on the above, MDOT cannot pay for the planning of watershed studies not directly involved with a construction or maintenance project that provides drainage of roads.  However, such studies that are the basis for petition projects (only the petitioned projects) with engineering and construction are eligible for payment of apportionments based on Section 14a of Act 51.

Rule 280.2 - Computation of Basic Benefits

Rule 2 (1) - The Michigan Department of Transportation is authorized by Section 14a of Act 51 of the Public Acts of 1951 to only pay drainage assessments for construction or maintenance of those county drains into which stormwater runoff from the State trunkline right-of-way flows. These basic benefits for the State trunkline system must be computed in direct proportion to the pro rata share of stormwater from the State highways within the drainage district to the total design stormwater runoff from the entire drainage district. The Department cannot pay for runoff which is not attributed to the trunkline system, e.g., from excess or non-highway properties.

In the normal course of administering the use and operation of the trunkline highway system, the Department applies certain standards, specifications, and maintaining traffic requirements for work performed by any agency or party within the trunkline rights-of-way. When it is necessary to require any of these items as part of a drainage project, the costs incurred are to be included as a part of the total project costs which are apportioned as basic benefits.

Rule 2 (4) - Oftentimes, when designing an enclosed county drain or intercounty drain which receives stormwater runoff from a State trunkline, the Drain Commissioner will not use the same rainfall intensity data used by the Department to design its storm drainage system. In those instances where the enclosed receiving county drain or intercounty drain facility has utilized a different rainfall intensity, the basic benefit computed for the State trunkline may be multiplied by the number which expresses the ratio of the design runoff from the State trunkline to the design runoff of the enclosed receiving drain according to the recurrence interval factors. The recurrence interval is related to the probability of a storm event of a specific magnitude occurring in any specific year. See Rule 9, Table II, Recurrence Interval Factors.

The recurrence interval factor will only be applied where stormwater runoff from the trunkline enters an enclosed receiving county drain or intercounty drain. It is imperative that the Drain Commissioner must contact either the Department's Drainage Coordinator or Drainage Engineer when consideration is being given to use of this multiplier. This contract should be made as early in the design process as is reasonably possible. As an example of its application, Drain Commissioners will oftentimes design an enclosed drainage facility for a 10-year storm frequency (probability of having a storm of this frequency or greater once every 10 years). The recurrence interval factor for the 10-year storm frequency is 1.6 from Rule 9, Table II. The Department, in designing its enclosed drainage facilities in depressed freeway sections, must use a 50-year storm frequency (probability of having a storm of this frequency or greater once every 50 years). The recurrence interval factor for the 50-year storm frequency is 2.2 from the table.

Applying the 50-/10-year ratio of 2.2/1.6, the recurrence interval factor would be 1.3750. This factor would be applied to those basic benefits assessed against the Department.

Rule 280.3 - Computation of Supplemental Benefits:

Supplemental benefits are those costs or benefits which exceed the normal treatment of a project. Supplemental benefits are of the following two general types:

Rule 3 (1) - In this category, this Department, on certain occasions, will request the Drain Commissioner to provide certain facilities, structures, or mechanical devices which exceed the needs of the drainage district.

The rules provide that these supplemental benefits shall be computed in the direct proportion of the estimated cost or the actual cost, if known, of such maintenance, improvement, facilities, structures, or mechanical devices to the estimated construction cost or the actual construction cost, if known, of the total project. The application of the supplemental benefit requires that there be a joint determination by the Department and the Drain Commissioner or drainage board. Examples of these are: additional manholes, catch basins, or culverts beyond that normally required for the drainage project. These devices or improvements would benefit the State trunkline and would be

included as a separate expense to the Department. A supplemental benefit would not also be included in the Department's basic benefit apportionment percentage.

Rule 3 (2) - Should the Department require special specifications or construction treatment exceeding that described above under basic benefits, the additional cost of these shall be computed in the direct proportion of the estimated cost or the actual cost, if known, of such special specifications or construction conditions to the estimated construction cost or the actual construction cost, if known, of the total project. Examples of these are: the additional costs to accommodate future needs or special situations. Note: This rule would apply if the Department requested the use of different culvert specifications or a special construction technique required for work performed in the State trunkline right-of-way. It should be noted that maintaining traffic requirements as specified in the Michigan Manual of Uniform Traffic Control Devices is not considered to be a special construction condition.

Likewise, jacking and boring culverts or sewers under a State trunkline may be considered a special requirement.

Those costs incurred when complying with the Department's special specifications or construction conditions would be included as a supplemental benefit to the Department, and would not be included in the Department's apportionment percentage, but would be billed separately from the Department's basic benefit assessment.

Supplemental benefits for State trunklines must be jointly determined to be necessary by both the Department and the Drain Commissioner or drainage board. This will require an agreement, reduced to writing, specifically detailing the extent and scope of the work to be performed as supplemental.

Rule 280.4 - Apportionments

Rule 4 (2) - There have been situations where a Drain Commissioner and the Department have agreed to perform additional work. The rationale for this rule was to provide an avenue whereby the Department and the Drain Commissioner could provide for the performance of construction work and equitably pay for this while not encumbering the drainage assessment process.

In this instance, it is important to realize that any additional drainage work being contracted by the Department must be validated by written agreements signed by all parties to the contract. Either a joint signed letter of understanding or a standard agreement coordinated with engineer of governmental coordination may be used.

Rule 280.9 - Tables

Table I - Runoff coefficients by type of surface are specified. Those shown in the table are to be applied with engineering judgment and will be acceptable.

Table II - Rainfall Intensity Conversion Factors. This table must be used to compute (i), the rainfall intensity such that duration = (ti) time of concentration.

Table III - Recurrence Interval Factors. This is applicable when stormwater runoff from the trunkline enters an enclosed receiving county drain or intercounty drain. See preceding discussion under Rule 2 (4).

## **Attachment A**

<u>MDOT Drainage Coordinators</u>

For MDOT personnel and contact information,
refer to the following site:

<http://www.michigan.gov/mdot/0,1607,7-151-9623_26662_10757-72237--,00.html>

# **Attachment B**

## **MDOT Drainage Coordination Responsibilities**

Updated: 10/31/2002

**MDOT DRAINAGE COORDINATION RESPONSIBILITIES**

**Contact:**   Gary F. Croskey, P.E., MDOT Drainage Coordinator, Design Support Area
(517) 335-2171, or email: croskeyg@michigan.gov

The following are the roles of responsibility for both the MDOT Drainage Coordinator and the Region and Transportation Service Center Drainage Coordinator (RDC).

## <u>MDOT'S DRAINAGE COORDINATOR, Design Support Area</u>

<u>INTRA AND INTERCOUNTY DRAINS</u>

1.   Receive daily correspondence and determine necessary action for the RDC.
   - Answer correspondence relating to county drains and copy correspondence to the appropriate RDC.
   - All correspondence is to be placed in the respective Drainage District file in Design Support Area.

2.   Receive "Apportionment Letter" and "Notice of Review of Apportionment Meeting."
   - Requires response within ten days.
   - Follow up with status of proposed construction project from the RDC. Require documentation and supporting data for any new or revised apportionments.
   - Either approve or object to the apportionment based on whether it meets administrative rules for Section 14a of Act 51, Public Acts of 1951, as amended, and notify RDC.

3.   Review proposal, plans, specifications, and engineering reports, for any intra and intercounty drain project. The review will determine if all drains crossing State trunklines meet MDOT design and construction standards.

4.   Maintain Statewide files of all intra and intercounty drain actions.

5.   Provide training to the RDCs and other development and delivery personnel.
   - Work with RDC for Statewide uniformity.
   - Resolve major issues with Drain Commissioners relating to Department policy issues.

6.   Initiate and approve county drain assessment payments. Maintain database of payments and budget used for maintenance and construction of county drain projects.

7. Upon request from RDC or Project Manager, initiate agreements (Section 433) or petitions for new drainage districts for department facilities. This action requires either Deputy Director of Bureau of Highway Development or Director signature.

8. Follow up on status of drain projects with Region Drainage Coordinator.

9. Member of the Michigan Association of County Drain Commissioners.

## Region Drainage Coordinator (RDC)

### INTRA AND INTERCOUNTY DRAINS

1. The Regional Drainage Coordinator (RDC) is MDOT's initial contact for each County Drain Commissioner in their area regarding both county drain construction and maintenance projects and MDOT's construction program.

2. Address questions from County Drain Commissioner relating to highway drainage.

3. Annually review MDOT's construction program with each Drain Commissioner.

4. Notice of Determination meeting for intra and intercounty drain projects may require MDOT attendance. MDOT is involved if a notice is sent. RDC should check MDOT Drainage Coordinator, Design Support Area, on drainage district boundaries to confirm MDOT's participation.

5. Notice of Day of Review of Apportionment:
If County Drain Commissioner or Drainage Board does not meet the 20-day requirement per MCL 280.154(4), a letter of objection to the Drain Commissioner will be sent by the MDOT Drainage Coordinator and copy to the RDC.

6. Provide coordination between the County Drain Commissioner and MDOT Project Managers during the department's design (development) and construction (delivery) phases. The RDC must be part of the scoping process for road and bridge projects. The RDC should provide drainage input at the Call for Projects, Scope Verification, Plan Review, and OEC meetings (development process.) The Project Manager is responsible per section 4.01.06C of the Road Design Manual to transmit plans to the County Drain Commissioners (per Section 328 of the Drain Code) and coordinate with MDOT Drainage Coordinator and the RDC.

7. If a county drain improvement project is needed for State trunkline drainage, request either an application for the establishment of a drainage district and a petition for a drain project, or a Section 433 agreement shall be initiated through the MDOT Drainage Coordinator.

8.   Provide MDOT Drainage Coordinator or Drainage Engineer with necessary information from the County Drain Commissioner on unresolved issues. Assist either the MDOT Drainage Coordinator or the Project Manager in resolving issues with the County Drain Commissioner.

9.   Field review the county drain construction and maintenance projects that MDOT is apportioned and assessed. Provide notice to MDOT Drainage Coordinator of project status or completion.

10.  For MDOT budgetary purposes, meet with County Drain Commissioners in each county to review MDOT participation on county drain projects and report anticipated expenditures to MDOT Drainage Coordinator.

11.  For maintenance work by county drain officials, direct the County Drain Commissioner to the appropriate local MDOT Construction permit personnel (see handout).

LOCAL AGENCIES DRAINAGE PARTICIPATION

12.  Assist the MDOT Drainage Coordinator with local agency contacts, MDOT Project Managers, and Design Support Area (Hydraulics/Hydrology Unit and Governmental Coordination and Railroad Unit) on any local agency or private stormwater participation agreement.

13.  For NPDES Municipal Stormwater Permits, provide assistance to the MDOT Stormwater Program Manager, MDOT Drainage Coordinator, and designated Region personnel (e.g., Resource Specialist), Stormwater Coordinator, and Region Environmental Permit Coordinator.

References:

1.   6/8/92 memo to District Engineers from Robert A. Welke, Deputy Director Bureau of Highways, establishing district drainage coordinator (note also 9/1/92 memo on Environmental Drainage Project Coordination.)
2.   6/19/97 minutes of Executive Staff, Bureau of Highway Technical Services, assigning functions of District Drainage Coordinator.
3.   7/7/97 memo to District Drainage Coordinators from David C. Spangenberg, Duties of Drainage Coordinators per 6/19/97 executive staff meeting.
4.   9/24/97 memo to District Engineers from M. Frierson, Administrator, Real Estate Division on County Drain Commission Coordination.
5.   4/27/98 memo to various staff from Gary D. Taylor, Chief Engineer/Deputy Director, Bureau of Highway Technical Services on County Drain Coordination.
6.   10/28/98 memo to Region Engineers and Drainage Coordinators from Gary Croskey, MDOT Drainage Coordinator, updating duties.

**Attachment C**

**Michigan Drain Code Procedures**

Attachment C                                    2-D-50



**Attachment D**

**Administrative Rules**

## DEPARTMENT OF STATE HIGHWAYS AND TRANSPORTATION AND DEPARTMENT OF AGRICULTURE

## DRAINAGE ASSESSMENTS

Filed with the Secretary of State on August 15, 1977

These rules take effect 15 days after filing with the Secretary of State

(By authority conferred on the department of state highways and transportation and the department of agriculture by section 14a of Act No. 51 of the Public Acts of 1951, as added, being ꞌ247.664a of the Michigan Compiled Laws)

R 280.1  Definitions.

Rule 1. (1) ꞈApportionmentꞏ means that portion or share of the total cost of a drainage improvement, expressed as a percentage, to be borne by the assessed party by reason of benefits to a state highway or county road.

(2)     ꞈAssessmentꞏ means the apportionment expressed as a monetary amount.

(3)     ꞈCounty roadꞏ means a roadway, including the right-of-way, under the jurisdiction of a county road commission. It includes property contiguous to a roadway owned in fee or easement by the county which is used for highway purposes. It does not include facilities such as garage sites and office buildings that are not contiguous to the highway right-of-way.

(4)     ꞈDepartmentꞏ means the Michigan department of highways and transportation.

(5)     ꞈDrainage districtꞏ means the total area of land contributing stormwater runoff to the drain or portion of the drain under consideration.

(6)     ꞈRainfall intensityꞏ means the rate of rainfall in inches per hour.

(7)     ꞈRunoffꞏ means that part of the rainfall which drains off the land rather than being absorbed.

(8)     ꞈRunoff coefficientꞏ means the ratio of the rate of runoff to the rate of rainfall at an average storm intensity if all the drainage area is contributing.

(9)     ꞈState highwayꞏ means a roadway, including the right-of-way, under the jurisdiction of the department which is part of a designated system of highways. It includes property contiguous to the highway owned in fee or in easement by the department which is used for highway purposes. It does not include facilities such as garage sites and office buildings that are not contiguous to the highway right-of-way.

R 280.2  Computation of basic benefits.

Rule 2. (1) Basic benefits for county roads and state highways shall be computed in direct proportion to the pro rate share of stormwater from county roads and state highways within the drainage district to the total design stormwater runoff from the drainage district.

(2)     Stormwater runoff quantities (Q) shall be determined for the drainage district by use of the accepted engineering formula, $Q = ciA$, this being the product of the runoff coefficient (c), referred to in table I set forth in Rule 9, the rainfall intensity (I), and the area of the drainage district (A). Rainfall intensity is assumed to be of uniform rate throughout the drainage district.

(3)     Stormwater runoff quantities (Q) for a county road or a state highway shall be determined by using the same method as that used for the entire drainage district. Computation examples are set forth in Rules 7 and 8.

(4)      If the rainfall intensity used in the design of a county road or a state highway drainage facility is not the same as the rainfall intensity used in the design of the enclosed receiving county drain or intercounty drain, the basic benefit computed for the county road or the state highway shall be multiplied by the number which expresses the ratio of the design runoff from the county road or state highway to the design runoff for the receiving county or intercounty drain according to the recurrence interval factors. (See Table II set forth in Rule 9.)

R 280.3  Computation of supplemental benefits.

Rule 3.(1)  Supplemental benefits for county roads and state highways, which shall result from maintenance, improvement, or the installation of facilities, structures, or mechanical devices jointly determined to be necessary by the highway jurisdiction and Drain Commissioner or drainage board to accommodate or relieve county road drainage or state highway drainage, shall be computed in the direct proportion of the estimated cost or the actual cost, if known, of such maintenance, improvement, facilities, structures, or mechanical devices to the estimated construction cost or the actual construction cost, if known, of the total project.

(2)      Supplemental benefits for county roads and state highways, which shall result by reason of special specifications or construction conditions required by county highway authorities and state highway authorities, shall be computed in the direct proportion of the estimated cost of the actual cost, if known, of such special specifications or construction conditions to the estimated construction cost or the actual construction cost, if known, of the total project

R 280.4  Apportionments.

Rule 4.(1)  Apportionments to a county for county road benefits and to the department for state highway benefits shall be based on benefits computed and determined under Rule 2 and Rule 3 except that such apportionments shall not include the cost of work performed under rule 4(2).

(2)      The department or a county road commission may enter into agreements with a Drain Commissioner or drainage board to perform additional work which is not subject to these rules. Cost of work performed under such agreements shall not be included with the assessments to the department or the county road commission.

(3)      A county road commission or the department shall be notified of its apportionments pursuant to Act No. 40 of the Public Acts of 1956, as amended, being '280.1 et seq. of the Michigan Compiled Laws.

R 280.5  Assessments.

Rule 5.(1)  Assessments shall be according to the apportioned ratio of the total cost of a project.

(2)      If a project is financed by the sale of bonds, evidence that the bonds shall be sold shall be presented with the apportionment notice.

(3)      Fifty percent of the cost of drain assessments against a county for drainage of county roads shall be paid by the county road commission from county road funds.

R 280.6  Reports.

Rule 6.Expenditures for county drain assessments shall be reported by each county road commission to the state highway commission. The reports shall be made as of December 31 of each year and shall be submitted by March 1 of the following year.

R 280.7  Average runoff coefficient; computation examples.

Rule 7. The following examples demonstrate the desired method of computing the Aaverage runoff coefficient@ (A.R.C.) for cross-sections commonly employed in the construction of county roads and state highways.

(a)    Cross-section A - dual roadway:

       300' ROW

       Consisting of:                        Tabulation:

       Pavement              2-24'           48'    x 0.90   = 43.2

       Paved shoulders       2-10'           20'    x 0.90   =18.0

       Gravel shoulders      2-8'            16'    x 0.50   = 18.0

       Berms                 216'            216'   x 0.20   = 43.2

                             Totals          300'            112.4

Average runoff coefficient: 112.4 / 300' = 0.375


(b)    Cross-section B - urban roadway:

       83' ROW

       Consisting of                         Tabulation:

       Pavement & C/G        57'             57'    x 0.90   = 51.3

       Sidewalks             2-5'            10'    x 0.90   =  9.0

       Berms                 16'             16'    x 0.20   =  3.2

                             Totals          83'             63.5

       Average runoff coefficient: 63.5 / 83' = 0.765


(c)    Cross-section C - dual roadway (depressed):

       240' ROW

       Consisting of:                        Tabulation

       Pavement & C/G        2-53'           106'   x 0.90   = 95.4

       Paved median          21'            21'    x 0.90   = 18.9

       Paved shoulders       2-9.5'          19'    x 0.90   = 17.1

       Berms                 94'             94'    x 0.20   = 18.8

                             Totals          240'            150.2

       Average runoff coefficient: 150.2 / 240' = 0.626

(d)    Cross-section D - rural roadway:

<u>66' ROW</u>

| Consisting of | | Tabulation | | |
|---|---|---|---|---|
| Gravel road | 20' | 20' | x 0.7 | = 14.0 |
| Gravel shoulders | 2.5' | 10' | x 0.5 | =  5.0 |
| Berms | 36' | <u>36'</u> | x 0.2 | = <u> 7.2</u> |
| | Totals | 66' | | 26.2 |

Average runoff coefficient: 26.2 / 66' = 0.397


R 280.8  Pro rata share of runoff for county roads and state highways; computation examples.

Rule 8.   The computations hereinafter set forth are included to clarify the method by which the pro rate share of runoff for county roads and state highways may be determined.

Formula:  Q = ciA

Q = runoff

c = runoff coefficient

i = rainfall intensity

A = area

Rainfall intensity is assumed to be constant throughout the drainage district, according to subrule (2) of rule 2, and since the apportionment is based on the pro rata share of the runoff, the rainfall intensity has been deleted from these computations.


(a)    Computation No. 1:

Given:

| | | |
|---|---|---|
| Drainage District | 670 acres | |
| State Highway ROW - dual roadway | 17.65 acres | |
| County Road ROW - rural type | 31.23 acres | |
| Remaining Lands - agriculture type | | |
| (See subdivision (c)). | 621.12 acres | |

Find:    The pro rata shares of the runoff for state highways, county roads, and remaining lands.

Solution:

| State Highway | 17.65 A x 0.375 | = | 6.619 equivalent runoff acres |
| County Roads | 31.23 A x 0.397 | = | 12.398 equivalent runoff acres |
| Remaining Lands | 621.12 A x 0.200 | = | 124.224 equivalent runoff acres |
| | 670.00 | | 143.241 equivalent runoff acres |

Pro rata share for state highways:      6.619 / 143.241 = 4.621%

Pro rata share for county roads:      12.398 / 143.241 = 8.65%

Pro rata share for remaining lands:      124.224 / 143.241 = 86.724%

(b)    Computation No. 2:

Given:

| Drainage District | 32.00 acres |
| State Highway ROW - urban type | 6.33 acres |
| County Road ROW - rural type | 1.47 acres |
| Remaining Lands - residential type | 21.42 acres |

Find:    The pro rata shares of the runoff for state highways, county roads, and remaining lands.

Solution:

| State Highway | 6.33 A x 0.765 | = | 4.842 equivalent runoff areas |
| County Roads | 1.47 A x 0.765 | = | 1.125 equivalent runoff areas |
| County Roads | 2.78 A x 0.397 | = | 1.104 equivalent runoff areas |
| Remaining Lands | 21.42 A x 0.500 | = | 10.710 equivalent runoff areas |
| Totals | 32.00 A | | 17.781 equivalent runoff areas |

Pro rata share for state highway:

$$\frac{4.842}{17.781} = 27.231\%$$

Pro rata share for county roads:

$$\frac{1.125 + 1.104}{17.781} = 12.536\%$$

12.536%

Pro rata share for remaining lands:

$$\frac{10.710}{17.781} = 60.233\%$$

60.233%

(c)    Utilities, railroads, or streets may also be subtracted from the total entitled "Remaining lands" and computed on an equitable "c" factor at the discretion of the assessing authority.

R 280.9  Tables –

    Rule 9.  The tables referred to in these rules are set forth as follows:

**Table I**

| Type of Surface | Runoff Coefficient |
| --- | --- |
| Concrete or Asphalt Pavement | 0.8  - 0.9 |
| Commercial and Industrial | 0.7  - 0.9 |
| Gravel Roadways and Shoulders | 0.5  - 0.7 |
| Residential - Urban | 0.5   - 07 |
| - Suburban | 0.3  - 0.5 |
| Undeveloped | 0.1  - 0.3 |
| Berms | 0.1  - 0.3 |
| Agricultural - Cultivated Fields | 0.15 - 0.4 |
| - Pastures | 0.1  - 0.4 |
| -Forested Areas | 0.1  - 0.4 |

**Table II**

| Rainfall Intensity Conversion Factors (Design of Drainage Channels, FHWA, Hydraulic Design Series No. 4) | | | |
|---|---|---|---|
| Duration (min.) | Factor | Duration (min.) | Factor |
| 5 | 2.22 | 40 | 0.8 |
| 10 | 1.71 | 50 | 0.7 |
| 15 | 1.44 | 60 | 0.6 |
| 20 | 1.25 | 90 | 0.5 |
| 30 | 1.00 | 120 | 0.4 |

Note: U.S. Weather Bureau says "Rainfall amounts for the 5-, 10-, and 15-minute durations may be obtained by multiplying the 30-minute values by 0.37, 0.57, and 0.72 respectively."

| Recurrence Interval Factors (Design of Drainage Channels, FHWA, Hydraulic Design series No. 4) | |
|---|---|
| Recurrence Interval in Years | Factor |
| 2 | 1.0 |
| 5 | 1.3 |
| 10 | 1.6 |
| 25 | 1.9 |
| 50 | 2.2 |

| Storm Rating | One-Hour Maximum Rainfall |
|---|---|
| 1 year | 0.428 |
| 5 years | 0.659 |
| 10 years | 0.762 |
| 25 years | 0.898 |
| 50 years | 1.000 |
| 100 years | 1.108 |
| Storm Rating Based on 50-year Maximum Rainfall (Handbook of Steel Drainage and Highway Construction Products, AISI, 2nd Edition) | |

**Attachment E**

**ACT 51 vs. The Drain Code on the "Benefit" Standard**

# CONTENTS

|                                                          | Page    |
|----------------------------------------------------------|---------|
| Conflict and Controversy                                 | 2-D-62  |
| Drain Code: "Benefits" Standard                          | 2-D-64  |
| Act 51 Section 14A, "Benefits" Equal Pro Rata Share      | 2-D-65  |
| Section 14A of Act 51 - Pro Rata Share                   | 2-D-68  |
| Act 40 (Drain Code) and Act 51 (Highway Law)             | 2-D-69  |

## ACT 51 vs. THE DRAIN CODE ON THE "BENEFIT" STANDARD

This section will discuss the definition of benefit standard that is defined in the Drain Code and MDOT's limitation of this standard by Act 51 legislation. The conflict and controversy over these benefit standards is discussed along with court case cites and attorney general opinions that frame these standards.

Public Act 51 was amended by the Legislature with the enactment of 1972, PA 327 which added Section 14a and stated, in part:

> "Expenditure of funds allocated by this Act to the Department of State Highways....., shall be made only if all apportionment of benefits of any nature or kind, determined or made for the drainage of county roads or state highways are made in accordance with rules jointly promulgated by the Department of State Highways and the Department of Agriculture.....(which) provide for an engineering determination of benefits based on the pro rata share of storm water runoff from the county road or state highways within the drainage district in direct proportion to the total storm water runoff in the entire drainage district." MCL 247.644a; MSA 9.1097 (14a).

Thus, Section 14a was added to 1951, PA 51 by 1972, PA 327 and required MDOT and the Department of Agriculture to adopt rules regarding how the Drain Commissioner determines the amount of assessment against MDOT and the several county road commissions.

In 1977, MDOT and the Department of Agriculture promulgated rules R280.1 et seq; pursuant to the authority set forth in 1951, PA 51 Section 14a. 1979, Administrative Code Rule, R280.2(1) provides the following:

> "Basic benefits for county road and state highways shall be computed in direct proportion to the pro rata share of stormwater from county roads and state highways within the drainage district to the total design of stormwater runoff from the drainage district."

Thus, the Michigan Department of Transportation and the Offices of the County Drain Commissioner have become inextricably involved in a relationship that allows the commissioner to construct and maintain county drains which benefit the state trunkline system and provide a method enabling the Department to financially compensate the drainage district for this benefit.

## CONFLICT AND CONTROVERSY

Act 51 (Michigan's Highway Law) v Act 40 (Michigan's Drain Code) the statutory standards for drainage apportionments against state and county highways:

There are two state statutes which govern drain apportionments against the Michigan Department of Transportation and County Roads. The Drain Code, 1956, PA 40, MCL 280.1 et. seq.; MSA 11.1001 et. seq.; (hereafter Drain Code) and MDOT's general enabling statute, 1951, PA 51, MCL 247.651 et. seq.; MSA 9.1097(1) (hereafter Act 51).

Act 51 established the motor vehicle highway fund and provides for its use and administration. 1972 PA 327 amends Act 51. Compatible with the purpose and object expressed in the title of Act 51, i.e., the control of the use and administration of motor vehicle highway funds, Section 14a of amendatory 1972, PA 327 provides for the expenditures of funds allocated by the act to the Department of State Highways and to the county road commissions to pay the cost of drain assessments under the Drain code with respect to state and county highways. However, Section 14a of 1972, PA 327 makes it a condition of using funds allocated by the act to pay drain assessments, that all apportionment of benefits of any nature or kind determined or made for the drainage of state highways or county roads, must be made in accordance with rules jointly promulgated by the Department of State Highways and the Department of Agriculture.

It is patent, however, that the provisions of Section 14a neither control nor limit the authority of a drainage board or a Drain Commissioner to make assessments for drainage benefits to state and county highways. Section 14a of 1951, PA 51, as added by 1972, PA 327, is not an amendment to the Drain Code of 1956.

Section 151 of the Drain Code of 1956 empowers the Drain Commissioner to assess any township, city, village, or county road commission as well as the state highway commission for drainage projects benefiting roadways under their respective jurisdictions. At various times villages, cities and county road commissions have attempted to satisfy the assessments against respective roadways from motor vehicle highway funds. The State's Attorney General has, on several occasions, consistently ruled that this was an improper use of those funds. OAG 1926-1928, p. 636 (February 9, 1928); OAG 1945-1946, No. 0-3142, p. 251 (March 1, 1945); OAG 1952-1954, No. 1577, p. 35 (September 3, 1952).

On the strength of these opinions, cities and villages have likewise been prohibited from applying motor vehicle highway funds to satisfy drain assessments. The legislative enactment of Section 14a of 1951, Act 51, has added by 1972, PA 327, now provides for the use of motor vehicle highway funds by counties to pay a part of drainage assessments made against them for county roads subject to the condition expressed therein, that apportionment of benefits be made in accordance with rules promulgated by the Department of Transportation and the Department of Agriculture. On the other hand, with respect to state trunkline highways, said statutory provision has restricted the use of motor vehicle highway funds to pay drainage assessments benefiting state trunkline highways because of the expressed condition.

Accordingly, the Drain Code of 1956, supra, governs the apportionment for drainage benefits to state and county highways and 1951, PA 51 as amended by 1972, PA 327, supra, controls the use of motor vehicle highway funds allocated thereunder to pay such

assessments made under the drain code of 1956, supra. Therefore, monies in the motor vehicle highway fund as provided in 1951, PA 51 as amended by 1972, PA 327, supra, may only be used to pay drainage assessments if apportionments against the State or county roads equals its pro rata share of the stormwater runoff for state trunkline highways or county roads within the entire drainage district, as set forth in rules promulgated by the Department of State Highways and the Department of Agriculture as required by 1951, PA 51, Section 14a as added by 1972, PA 327, supra. See Attorney General's letter to Senator Rozycki, dated May 16, 1973, contained in the Digest of Informal Opinions.

Payment of a drainage assessment in excess of one complying with the requirements of Section 14a could be held to constitute an ultra vires act.

## DRAIN CODE: "BENEFITS" STANDARD

When the Drain Commissioner undertakes to construct a county drain, he assesses the cost under authority of Section 262 of the Drain Code, including assessment of that portion of the cost to be assessed against the State Highway Commission for "benefits" accruing to the state trunkline highway.

Section 154 (4) of the 1956 Drain Code establishes the procedures for apportionment of benefits to be made against state trunkline highways, as follows:

> "[(4)   when] an apportionment of benefits is made against a state trunkline highway, unless the state highway director consents in writing to the apportionment, the Drain Commissioner, at least 20 days before the review on the trunkline, shall notify by registered mail the state highway director of the percentage apportioned against the highway and the date, time and placed fixed for a review of apportionments of benefits. If the state highway director desires to have the apportionment of benefits reviewed by the director of (the Department of Agriculture), the state highway director, within 10 days from the receipt of notice, shall file with the Drain Commissioner an objection to the apportionment. The Drain Commissioner shall notify the director of the Department of Agriculture of the date, time and place fixed for the review of apportionments, and at the meeting the director of the Department of Agriculture or a deputy (of the director) shall review the apportionment made against the state trunkline highway, listen to the proofs and allegations of the parties, and may view the highway befitted. The action and decision (on the apportionment) reduced to writing shall be final." MCLA 280.154; MSA 11.1154.

There is no mandatory provision in Section 154 (4), supra, that requires the deputy director, Department of Agriculture, to base his apportionment on any mathematical formula, and where all of his acts are accomplished in conformity with the provisions of Section 154 (4), quoted above. The administrative decision as to the amount of the apportionment is final, and becomes a lien upon the real property acquired for public highway purposes. The apportionment is not subject to judicial review, absent a clear

showing of fraud or bad faith. See Attorney General ex rel State Highway Commissioner v Zantman Intercounty Drainage Board, 17 Mich App 110 (1969); People ex rel State Highway Commissioner v Macomb County Drain Commissioner, 369 Mich 654 (1963). Section 151 of the Drain code sets out how the Drain Commissioner is to make his apportionments, in part, as follows:

> "He shall apportion the percent of the cost of construction of such drain which any state trunkline highway, under the control of the state highway commissioner, shall be liable to pay by reason of benefits therefore and as the means of improving said highway." MCL 280.151; MSA 11.1151 (Expression added).

Thus the Drain code adopts a percent benefits standard and recognizes that such an apportionment is a "means of improving said highway." This second feature was, no doubt, included to show that an apportionment based on "benefits" for a highway represents a proper expenditure of restricted transportation funds; the drain is a "means of improving said highways." See Constitution 1963, Article 9, Section 9, for the restriction on expenditures of transportation funds.

The Drain Code provides for similar percent benefit determinations to be made against any township, city or village, county road commission, state trunkline highway and all parcels of land within the drainage district. In that way the Drain Commissioner spreads one hundred percent of the cost of the drain improvement among all those categories of beneficiaries according to the relative benefit each receives:

> Such percent so apportioned when finally approved shall be assessed against such townships, cities and villages and against the county at large by reason of the improvement of the highways within the drainage district, and against the state by reason of the improvement of the state trunkline highways within such drainage district against all parcels of land therein according to such apportionment of benefits as herein provided. (Emphasis added). MCL 280.151.

This statutory language also confirms that once the apportionment is calculated on the basis of "benefits", it shall then be actually assessed against the highway authorities "by reason of" the highway improvement.

## Act 51, SECTION 14A, "BENEFITS" EQUAL PRO RATA SHARE

Act 51 limits the "benefits" standards insofar as state highways and county roads are concerned. It also expressly prohibits use of restricted transportation funds to pay an apportionment which,

> "Shall be made only if all apportionments of benefits of any nature or kind determined or made for the drainage of county roads or state highways are made in accordance with rules jointly promulgated by the Department of State Highways and the Department of Agriculture.....which provide for an engineering

determination of benefits based on the pro rata share of stormwater runoff from the county roads or state highways within the drainage district in direct proportion to the total stormwater runoff in the entire drainage district."

Section 14a added by the legislature to 1951 PA 51 by 1972 PA 327 (MCLA 247.664a; MSA 9.1097 (14a).

Section 14a of Act 51 is the specific provision that relates to drain apportionments. That section was added to Act 51 by 1972 PA 327 fifteen years after enactment of the Drain Code in 1956 PA 40.

Administrative rules were duly promulgated pursuant to that statute. See 1979 AC, R280.1 et seq. P. 815. Accordingly, MDOT is prohibited by Section 14a to paying only that part of a drain apportionment which is "based on the pro rata share of stormwater runoff from the state highways within the drainage district in direct proportion to the total stormwater runoff in the entire drainage district."  See also R280.2.

Purpose of the Drain Code: It is apparent from the terms of the Drain Code that the cost of a drain project is to be apportioned among all the properties within the drainage district on the basis of benefits to the property. Short of the general policy that the cost of constructing and maintaining drains shall be apportioned upon the principle of benefits derived, the Drain Code provides no specific direction in that regard. The apparent reason for this lack of hard and fast rules is that judicial rulings have supported the position that a substantial portion of apportionment of costs is based on the "best judgment" of the Drain Commissioner. From a Drain Code viewpoint, in apportioning benefits derived, there are no fixed or common formulae in use.

The general rule subscribed to by the Drain Commissioners is that the amount of a drain assessment is not judicially reviewable unless the record establishes (i) that the assessments were not levied in accordance with the best judgment of the Drain Commissioner or the drainage board or (ii) fraud or bad faith existed. The following illustrates this position:

In re Petition of Macomb County Drain Commissioner, 369 Mich 641 (1969), the State's appeal of a Chapter 20 drain assessment for highway benefits was denied. The court accorded that a presumption of good faith is afforded to determination of special assessments.

"The presumption is that, in making the district and the assessment, the officers of the municipality acted in good faith, and have correctly and faithfully exercised the discretion reposed in them. In such case, where mistakes or abuse of discretion is not manifest or demonstrable, the determination of the municipal officers in whom such discretion is vested is conclusive and it is not reviewable by the courts. 369 Mich et 649, quoting from City of Grand Rapids v Bowers, 98 Mich 393, 397. The Bowers case also cites with approval at 369 Mich 649 the famous passage written by Justice Oliver

Wendell Holmes in Chicago, Burlington and Quincy Railroad Company v Babcock, 204 US 585, 598:

> .....the board was created for the purpose of using its judgment and its knowledge (citing cases). Within its jurisdiction, except, as we have said, in the case of fraud or a clearly shown adoption of wrong principles, it is the ultimate guardian of certain rights. The State has confided those rights to its protection and has trusted to its honor and capacity as it confides the protection of other social relations to the courts of law. Somewhere there must be an end.....”

The Michigan Supreme Court rejected the argument that Section 468 of the Drain Code requires the special assessment against the State to be based upon a mathematical formula:

> “.....the section, providing as it does no definite formula for ascertainment of apportionment based on “drainage of state highways,” simply expresses an idea– persuasive of course that approximate attainment therefore is always in order– that the State or county be charged no greater part of the total cost than is reasonably necessary to provide proper drainage of participant State or county highways.
>
> The question of the amount of the respectively apportioned assessments remains one of judgment. An administrative determination which by the laws of necessity must be based in part on the vagarious tempers and tempests or weather over a long period of years must, as before, remain immune from substitution–on certiorari–of judicial opinion and judgment for that of statutorily appointed administrators.”  369 Mich at 651,652.

Attorney General, ex rel State Highway Commission, Zantman Intra-County Drainage Board, 17 Mich App 110 (1969).

The Michigan Court of Appeals found, “there is no mandatory provision in the (Drain Code) statute which requires the drainage board to base its assessment on any mathematical formula.” All of the acts of the board were accomplished in conformity with the enabling statute. The mathematical apportionment computation and expert testimony upon which it was based was considered by the board, but the board was not bound by it. Statutory authority for apportioning and assessing drain costs was given to the drain board only.

In this case there was evidence that the drain board did use its best judgment and therefore, no judicial review was warranted unless there was fraud or bad faith present. Neither fraud nor bad faith was claimed herein. The record in the instant case disclosed no abuse of discretion. We conclude that the assessments were not arbitrary or capricious, the requirements of the statutes were followed, the established legal precedents were not violated and the apportionment was fully within the power and jurisdiction of the board as permitted by statute.”

In record Ten Mile Drain, 371 Mich 209 (1963).

The Michigan Supreme Court found no evidence in the record to support that the drainage board used its best judgment.

> "Since the 6-3-1 formula was adopted by the board in making the present reviewed apportionment, and since the formula was based solely on what might well have been fair apportionment 30 years ago, we are constrained to find that the board was guilty of an arbitrary determination constituting a demonstrable abuse of discretion. The board, indeed, may have apportioned the cost of this drain according to its best judgment, but the phrase 'best judgment' necessarily implies judgment based upon legally definable evidentiary support.
>
> There is no such support here....." 371 Mich 213

## SECTION 14A OF ACT 51 - PRO RATA SHARE

By its terms, Section 14a of Act 51 is a limitation on the amount of Restricted Funds which may be used to pay drain assessments. The existence of that restriction reveals a legislative intent to guard against disproportionate drain apportionments being made which divert monies from the perceived "deep pockets" of the Restricted Fund. However worthy the purpose may appear, Constitution 1963 Article 9, Section 9, prohibits use of the Restricted Fund for anything other than "transportation purposes" as that term is constitutionally defined.  Constitution 1963, Article 9, Section 9 provides that:

> "All specific taxes, except general sales and use taxes and regulatory fees, imposed directly or indirectly on fuels sold or used to propel motor vehicles upon highways and to propel aircraft and un-registered aircraft will, after the payment of necessary collection expenses, be used exclusively for transportation purposes as set forth in this section....." See County Road Association of Michigan v Michigan Department of Transportation 94 Mich App 242; 288 NW 2d 382 (1979).

It may also be noted that appropriations have been made to MDOT which it may use to pay drain assessments levied without regard to the Section 14a standard. See, for example, MDOT Fiscal Year 1990 Appropriations Act 1990, PA 202.

Constitution 1963, Article 9, Section 17 would therefore prohibit payment because there would be no appropriation to pay for it. Section 17 states:

> "No money shall be paid out of the state treasury except in pursuance of appropriations made by law."

## ACT 40 (DRAIN CODE) AND ACT 51 (HIGHWAY LAW)

Sections 151 and 323 of the Drain Code address the same subject as Section 14a of Act 51. It is possible to read the language of the more specific Act 51 as consistent with the more general language of the Drain Code. The reverse is simply not true. If the Drain Code is read to allow apportionment and payment for "benefits" calculated without regard to Section 14a, then Section 14a must be disregarded.

> Note: In an informal letter opinion of the Attorney General to Senator Stanley F. Rozycki, May 16, 1973, it was found that Section 151 of the Drain Code and Section 14a of Act 51 could be read independently. However, the Attorney General was not asked to address Section 323 of the Drain Code.  (Item B, p. 4).

To disregard Section 14a would require some finding of constitutional infirmity and none has been identified. Moreover, the constitutional rule of statutory construction is to ascertain and give effect to the intention of the legislature. Browden International Fidelity Insurance Co. 413 Mich 603, 611; 321 NW 2d 668 (1982). Whenever possible a statute should be interpreted in a manner which avoids a finding of unconstitutionality. Workman v Detroit Automobile Inter-Insurance Exchange, 404 Mich 477, 510: 274 NW 2d 373 (1979). Where two statutes address the same subject, neither should be given an effect which negates the other. People v Smith, 423 Mich 427, 441-441, 378 NW 2d 384 (1985).

With specific regard to the Drain Code and the general highway law, the Michigan Supreme Court found in Eyde Brothers Development Company v Eaton County Drain Commissioner, 427 Mich 271, 292, 398 NW 2d 297 (1986) that they are "statutes having a common purpose and must be construed in <u>pari materia</u> to give the fullest effect to each provision.

A similar conclusion should be reached when trying to relate the Drain Code and Act 51. Section 14a could be read as the controlling standard without any departure from the intent of the Drain Code. Section 14a is a reasonable specification of "benefits" and it carries out the over-riding constitutional limitation with regard to the use of restricted transportation funds.

Accordingly, it is the Michigan Department of Transportation's position that "benefits" for drainage improvements for State highways should be calculated and paid in accordance with the general requirements of the Drain Code as legislatively defined in Act 51.